263 So.2d 413 (1972)
MATLOCK OIL CORPORATION et al., Plaintiffs-Appellants,
v.
C. H. C. GERARD et al., Defendants-Appellees.
MATLOCK OIL CORPORATION et al., Plaintiffs-Appellants,
v.
Harper P. COLVIN et al., Defendants-Appellees.
MATLOCK OIL CORPORATION et al., Plaintiffs-Appellants,
v.
Hassie Hunt TRUST et al., Defendants-Appellees.
Nos. 11849-51.
Court of Appeal of Louisiana, Second Circuit.
May 23, 1972.
Rehearing Denied June 27, 1972.
Writ Refused July 31, 1972.
Shuey, Smith & Carlton, by I. Henry Smith, Jr., and W. Gene Carlton, Shreveport, for Matlock Oil Corp., McRae Funds, Inc., Petrofunds, Inc., Dal-Long Oil Company, and O. Biller, plaintiffs-appellants.
Fred L. Jackson, Homer, Curator ad hoc, for James W. Pratt, Vera Thompson, Fair Butler Digby, Dr. Rease Mitcham, Daucie B. Pratt, Vann L. Pratt, John Paul Pratt, *414 Mabel L. Klein Deer, and Mabel L. Klein Deer Trust, defendants-appellants.
Spencer and Spencer, by J. V. Spencer, III, Fred L. Jackson, El Dorado, Ark., for Walter J. Giller, as managing trustee of the Anna W. Giller Trust, defendants-appellants.
Meadors, Atkins and Meadors, by George H. Meadors and W. F. M. Meadors, Jr., Homer, for George G. Gill, Paulyn Gill Dougherty and Ruth Gill James, defendants-appellants.
Cook, Clark, Egan, Yancey & King, by Clarence L. Yancey, Shreveport, for Henry Leon Brenner, defendant-appellant.
Blanchard, Walker, O'Quin & Roberts, by Robert Roberts, III, and Clyde W. Thurmon, Shreveport, for Cortez Hicks Laurence, C. H. C. Gerard, and Harper P. Colvin, defendants-appellees.
Downs & Dixon, by Herschel M. Downs, Shreveport, J. R. Goff, Arcadia, for Hassie Hunt Trust, Lula Mitcham Thompson, Myrtie Thompson McDonald, Dr. Donald Thompson, Marjorie Thompson Alexander, Joe Thompson, David Thompson, Bobbye Thompson Mann, Lucille Thompson Ramsey, and Clara Thompson Isom, natural tutrix of the minor, Cynthia Louise Thompson, defendants-appellees.
Before AYRES, BOLIN, and HALL, JJ.
En Banc. Rehearing Denied June 27, 1972.
AYRES, Judge.
By these actions for declaratory judgments, plaintiffs seek to be recognized as the owners of certain oil, gas, and mineral leases. These cases were consolidated for trial in the court below and have likewise been consolidated for argument in this court. Plaintiffs are the same in all three cases, as are the issues of fact and of law. Differences consist only with respect to the individualities of the defendants and of the tracts of land involved.
Made defendants in each of these cases are the present record surface owners,[1] their lessees, and plaintiffs' lessors. Plaintiffs' lessors, however, espouse plaintiffs' cause. Thus, the opposing sides in this litigation are plaintiffs and their lessors on the one hand and the surface owners and their lessees on the other.
Although the surface ownership of the various parcels of land involved in these actions is not at issue, a resume of facts pertaining to such ownership will promote a clearer understanding of both facts and issues as the first are discussed and the latter resolved.
The record surface owners of the property in Suit No. 11,849 are Grover C. Hicks and Cortez Hicks Laurence. The property involved is described as the West 15 acres of the SW ¼ of the SW ¼, Sec. 33, T. 22 N., R. 4 W., Claiborne Parish. The record surface owner of the property involved in Suit No. 11,850, namely, the North ½ of the SE ¼ of the SW ¼ and SE ¼ of the SE ¼ of the SW ¼, of the aforesaid section, is Harper P. Colvin. The property involved in Suit No. 11,851, described as the East 25 acres of the SW ¼ of the SW ¼, likewise of the aforesaid section, is owned by the surviving widow of W. H. Thompson and his descendants.
Grover C. Hicks and his co-owner, Cortez Hicks Laurence, under date of September 19, 1969, executed an oil, gas and mineral lease in favor of C. H. C. Gerard covering the 15 acres of the first-described tract. Harper P. Colvin, under date of September 17, 1969, also executed an oil, gas, and mineral lease in favor of Gerard covering the property secondly described hereinabove. Under dates of November 14 and December 4, 1968, the widow and heirs of W. H. Thompson executed an oil, gas, and mineral lease to Hassie Hunt Trust covering the property as lastly described.
*415 The property presently owned by Hicks and Mrs. Laurence and the property presently owned by the widow and heirs of W. H. Thompson were at one time owned by Mrs. Selma Skinner Jones. During the period of her ownership, Mrs. Jones conveyed the following mineral interests:
1. One-half of the oil, gas, and other minerals in the property to W. J. Reynolds by instrument dated March 17, 1938;
2. Three-tenths of the oil, gas, and other minerals to R. L. Coleman by instrument dated February 26, 1940; and
3. Two-tenths of the oil, gas, and other minerals to O. N. Meadows by instrument dated September 9, 1940.
Through various conveyances, the lastmentioned mineral interest came to be owned of record by Mrs. Fair Butler Digby, George G. Gill, Paulyn Gill Dougherty, Ruth Gill James, Cortez Hicks Laurence, C. P. White, Jr., Mrs. Daucie Butler Pratt, Vann L. Pratt, James W. Pratt, John Paul Pratt, Dr. Rease Mitcham, Mrs. Vera Thompson, and Dr. Donald Thompson. Each of the parties just named above, except Cortez Hicks Laurence and C. P. White, Jr., executed oil, gas, and mineral leases covering any interest each may have owned at the time of the execution of the leases. Through various conveyances these leases are now owned of record by plaintiffs.
Preceding Harper P. Colvin's acquisition of the ownership of the property described in Suit No. 11,850, prior owners thereof conveyed mineral interests as follows:
1. One-half of the oil, gas, and other minerals by C. E. Graves to O. N. Meadows through instrument dated March 9, 1940;
2. One-half of the minerals through instrument dated April 4, 1946, executed by W. H. Klein to Mabel Klein Deer Trust.
By various conveyances these mineral interests came to be owned by Anna W. Giller Trust, Henry Leon Brenner, Dr. Rease Mitcham, Mabel L. Klein Deer Trust, and Mabel L. Klein, who subsequently executed oil, gas, and mineral leases covering their aforesaid acquired interests, which leases are now also owned of record by plaintiffs.
Prior to acquisition by the present record owners of the 25-acre tract involved in Suit No. 11,851, Mrs. Selma Skinner Jones, former owner of the entire SW ¼ of SW ¼ of Sec. 33, conveyed certain mineral interests to W. J. Reynolds, R. L. Coleman, and O. N. Meadows affecting not only the 25-acre tract but the 15-acre tract as well. Thus, plaintiffs' titles arise from various conveyances and transactions made by former owners of the respective properties prior to the acquisition of title by the present record owners.
The broad issue involved in these causes is whether 10 years' liberative prescription has accrued and extinguished the aforesaid mineral servitudes which affected the SW ¼ of the SW ¼ of the aforesaid Sec. 33, T. 22 N., R. 4 W.
No well has been drilled and no operations in search of oil, gas, or other minerals have been conducted on the properties affected by the aforesaid mineral servitudes, that is, on the SW ¼ of SW ¼, Sec. 33, T. 22 N., R. 4 W. Two wells, however, have been drilled in the vicinity, and appellants rely upon these operations to maintain the servitudes in force. These wells are the Hassie Hunt Trust-Fuller Well No. 1, located on the NE ¼ of SW ¼ of the aforesaid Sec. 33, and the Matlock Oil Corporation-Fuller Well No. 1, located on the SE ¼ of NW ¼ of the aforesaid Sec. 33.
This statement of facts is in accord with the stipulation entered into and made part of the record. Evidence offered corroborated the stipulation.
It was further stipulated that during 1946, the well referred to as Hassie Hunt *416 Trust-Fuller No. 1 was drilled to a total depth of approximately 7,900 feet. This well was completed as a dual producer, producing gas and distillate from the Bodcau Sand and oil and gas from the Lower Alford Sand. For production from these sands, the interested parties established a voluntary unit comprising the West ½ of Sec. 33. The three servitude tracts involved here were within this unit. This well produced from the lower sand until January of 1951 and from the upper sand until July of 1959.
During August of 1959, workover operations were conducted without success for the reestablishment of the well as a producer. The permit to abandon the well was granted by the Department of Conservation on March 25, 1960, and the well was actually and physically plugged and abandoned during May of 1960.
In early 1969, the drilling of Matlock-Fuller Well No. 1 was begun at a location in the SE ¼ of the NW ¼ of Sec. 33, which was not on any of the servitude tracts. Plaintiffs contend that thereafter, on January 19 and 20, 1969, the Lower Hosston Formation was encountered, tested, and found to be nonproductive. Operations continued, and the well was completed on June 12, 1969, as a producer of oil from the Sexton Formation at a depth of 8,880 to 8,896 feet. With an effective date of December 12, 1969, the Commissioner of Conservation issued Order No. 9-R creating and establishing the West ¼ of Sec. 33 as the production unit for the Sexton Formation and designating the aforesaid well as the unit well.
Pursuant to written reasons, judgment of the trial court was rendered in favor of the landowners decreeing that the mineral servitudes were extinguished by the liberative prescription of 10 years. All instruments pertaining to the mineral servitudes and the oil, gas, and mineral leases theretofore granted by the claimants under or through the mineral servitudes were ordered canceled and erased from the records. This judgment is, therefore, predicated upon a finding there were no workover operations conducted on the Hassie Hunt Trust-Fuller Well No. 1 looking toward restoration of production after August of 1959, and that, accordingly, 10 years elapsed before December 12, 1969, when the lands involved were included in a unit created by the Commissioner of Conservation on which was located another well, the Matlock Oil Corporation-Fuller Well No. 1, which was, as aforesaid, productive of oil in the Sexton Sand.
We not only find no error in the aforesaid conclusion reached by the trial court but the record, in our opinion, clearly establishes that no workover operations were conducted on the former well after August of 1959. The records of Hassie Hunt Trust, operator of the well, and the work records of Hinton Well Servicing, Inc., which performed the workover operations, make it clear that no such work was conducted after August of 1959. Correspondence between Hassie Hunt Trust and Pan American Petroleum Corporation, part owner of the well, is corroborative of that fact. Moreover, Ray Eubank, district engineer for Hassie Hunt Trust and supervisor of the field where this well was located, testified that the unsuccessful workover operations were concluded in August of 1959, and that, thereafter, no further work was done on the well other than to plug and abandon it. The actual plugging operations were begun on May 19, 1960, and completed on May 26, 1960, when the casing was pulled from the well and the hole closed with cement.
Testimony of two witnesses who had observed operations on the well, while tending to contradict not only the records kept by Hassie Hunt Trust and the Pan American Petroleum Company but the testimony of Eubank, was weak due to the frailty of the human mind after a lapse of 11 years. Moreover, the testimony of these witnesses, James Robert Fuller, a landowner, aged 75, and Lee Smart, a retired field superintendent for Hunt Oil Company, disclosed *417 its weakness by the failure of these parties to remember or to recount other important facts and circumstances with reference to the well. They were unsure of their testimony. The trial court found the written records to be more reliable, and we find no error in the conclusion that no operations looking toward the restoration of production were conducted on the Hassie Hunt-Fuller Well No. 1 after August of 1959.
It is appropriate to point out here that the important date is not that on which the well was actually abandoned or plugged but rather the last date on which drilling or production operations were conducted. LSA-R.S. 30:112, subd. A, provides:
"Except as otherwise provided by R.S. 9:5806, prescription shall begin to run on a mineral servitude on the day on which the servitude is created, provided, however, that in the event a bona fide attempt is made to drill for or produce minerals, or in the event that there is actual production, prescription shall be interrupted and shall commence to run again on the last day of production or the last day actual drilling or production operations are conducted on the property, regardless of whether an application to abandon the well shall have been filed with the Louisiana department of conservation, or regardless of whether said well shall be actually plugged and abandoned, or in the event of contracts providing for shut-in rental payments in lieu of production, prescription shall commence to run again at the end of the period for which the last such rental payment was made in the event of no production."
Thus, August of 1959 becomes the date from which liberative prescription of 10 years began running.
Appellants contend the act of drilling Matlock-Fuller Well No. 1 through the Lower Hosston Formation on the drilling and production unit established for that formation interrupted the running of prescription and preserved the mineral servitudes in question which were located within that unit. In support of this, appellants cite the ruling in Mire v. Hawkins, 249 La. 278, 186 So.2d 591, 596 (1966). After discussing the policy reasons for establishing drilling and production units the court held that good-faith drilling on any part of a unit is to be considered as good-faith drilling as to the whole unit and as a user of all the servitudes located within the unit. From this rule, it is obvious that only good-faith drilling can have the effect of interrupting the running of prescription. We conclude that in this connection "good-faith" drilling means a bona fide attempt to obtain production.
The record must be reviewed to determine if the appellants made a bona fide attempt to obtain production from the unitized Lower Hosston Formation and thus exercised their servitudes as to other tracts within the unit before liberative prescription had run.
Under date of February 1, 1966, the Department of Conservation issued its Order No. 9-P establishing as a drilling and production unit for the Lower Hosston Formation the West ½ of the aforesaid Sec. 33. In the order, particular locations were specified for wells drilled within the unit to the Lower Hosston Formation. There it was particularly recited:
"... 5. That, except as is provided in Finding 4, above, any well hereafter drilled to the Lower Hosston Formation of the Northeast Lisbon Field, whether within one of the proposed units, or outside thereof, should be located within 300 feet of the center of either the Northeast governmental quarter-section or the Southwest governmental quarter-section of the governmental section in which said well is drilled."
The Matlock-Fuller Well No. 1 was begun in early January of 1969. Its location was the SE ¼ of the NW ¼ of the aforesaid *418 Sec. 33 which was not within the area specified for a well being drilled to the Lower Hosston Formation and which was not on any of the servitude tracts. Moreover, the application for the permit to drill this well requested permission to drill an oil well with a total depth of 10,600 feet, and the proposed completion zone was listed as the Smackover Formation. The applicable Department of Conservation order was shown to be No. 29-E. Had appellants intended to obtain production in the Lower Hosston Formation as defined in Department of Conservation Order No. 9-P, the application would have requested a permit to drill a gas well with a total depth of not more than 7,200 feet, and, of course, the proposed zone of completion would have been the lower Hosston Formation. The appropriate Department of Conservation order would have been No. 9-P.
Pat Mason, the consulting geologist hired to watch the drilling of this well, testified he did not core the well while drilling through the Lower Hosston Formation. An unmanned mud-logging unit was installed on the well on January 23, 1969, when the drilling had reached 6,972 feet. The next day, the drilling reached 7,286 feet, a depth below the lowest point of the Lower Hosston Formation. Mason admitted the usual practice was to install the mud-logging unit several days in advance of the time a prospective formation was encountered. In this case, the mudlogging unit was not installed until the drilling had almost passed through the Lower Hosston Formation. Mason also admitted that he did not inquire about the testing done on the Lower Hosston Formation at the time the Hassie Hunt-Fuller Well No. 1 had been drilled even though that well was located nearby and had been a producer. The daily drilling report for this well was not begun until January 22, 1969, and the drilling had completely passed through the Lower Hosston Formation two days later. This same report shows conclusively that the real testing on this well was conducted in March of 1969 when the drilling had reached a depth of more than 8,880 feet.
All of this leads us to the same conclusion as was reached by the trial court. Appellants simply did not intend to obtain production from the Lower Hosston Formation through Matlock-Fuller Well No. 1. Even more importantly, no bona fide attempt was made to test this particular formation; therefore, there was no good-faith drilling as to the unit established for drilling and production from the Lower Hosston Formation. There was no interruption of prescription running against those mineral servitudes on tracts of land within the unit. There having been no use of the servitudes in question within 10 years, they were extinguished when 10 years' liberative prescription accrued in August, 1969. The law does not favor unwarranted extensions of interruption of liberative prescription on mineral servitudes, but favors the timely return of outstanding minerals to the owner of the land. Mire, supra, at page 597.
For the reasons assigned above,
It is ordered, adjudged, and decreed that each of the judgment of the trial court in the three above-entitled cases be, and each is hereby, affirmed at plaintiffs-appellants' costs.
Affirmed.
NOTES
[1] The term "surface owners" is used to distinguish land ownership from leasehold or mineral interests or servitudes.