337 So.2d 561 (1976)
Leo H. HUHN et al., Plaintiffs-Appellants,
v.
MARSHALL EXPLORATION, INC., Defendant-Appellee.
No. 12975.
Court of Appeal of Louisiana, Second Circuit.
August 31, 1976.
Rehearing Denied September 27, 1976.
Writ Refused December 3, 1976.
*563 Rothell & Lawson by David A. Rothell, Mansfield, for plaintiffs-appellants.
Colvin, Hunter, Brown & Plummer by D. Scott Brown and Robert E. Plummer, Mansfield, for defendant-appellee.
Before HALL, MARVIN and JONES, JJ.
En Banc. Rehearing Denied September 27, 1976.
MARVIN, Judge.
Plaintiffs appeal the rejection of their demands for cancellation of an oil and gas lease granted by their deceased ancestor for whom they were substituted as plaintiffs after suit was filed.
Leo Huhn, plaintiffs' ancestor, granted the lease on an M. L. Bath Company lease form, Louisiana Spec. 14 BR1 2A (1-63), for a six month primary term beginning June 1, 1969. Huhn's lessee assigned the lease to defendant, Marshall Exploration, Inc. Marshall assigned a fractional interest in the lease to White Shield Oil and Gas Corporation in 1969, but reacquired this interest on June 5, 1973.
On November 14, 1969, the State Department of Conservation granted a permit to Marshall's assignee to reenter and deepen an old, but non-productive and plugged well on the leased property known as the Huhn No. 1 well. Marshall's engineer and the company records establish that Marshall set up a drilling rig and conducted operations at the Huhn well site between November 26 and November 30, 1969, including eight hours of drilling through the cement plug in the old well on November 30. The record establishes that the operations on the Huhn well continued without significant lapse or interruption through a Schlumberger test on December 12 and the well being made productive about December 27, 1969. Once productive, the well was connected to a pipeline about July 22, 1970, and has since produced gas and distillate in small quantities.
Plaintiffs contended below, and urge as specifications of error here, that the lease should have been cancelled or forfeited because of
(1) The lessee's failure to engage in drilling operations within the six-months primary term;
(2) The lessee's failure to maintain production for a consecutive four-month period; and
(3) The lessee's failure to pay production royalty for a thirteen-month period when the well was producing.
The lower court rejected each contention of plaintiffs and we affirm for reasons hereafter given.

DRILLING WITHIN THE PRIMARY TERM?
Plaintiffs had two witnessesa brother and a nephew of original plaintiffwho testified they were often hunting on the property in late November and in December 1969, but saw no activity at the old well site until mid-December, 1969. Trial was held in June, 1975. The lower court said it "could only conclude that [these witnesses] were in error as to the dates [they were on the property]." The lower court accepted the contrary testimony of Marshall's engineer and the business records of Marshall, summarized above. We find no error in the lower court concluding that Marshall was engaged in drilling operations at the expiration of the primary term of the lease on December 1, 1969.
Paragraph five of the lease expressly contemplates such a situation in this language:
". . . If at the expiration of the primary term oil, gas or other mineral is not being produced . . . but lessee is then engaged in drilling or reworking operations . . . the lease shall remain *564 in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land . . ."
The setting up of a rig and drilling through a cement plug of an old well on the last day of the primary term does constitute being "engaged in drilling operations" within the intendment of paragraph five of the Bath 14 BR1 2A (1-63) lease form so as to maintain the lease in force beyond the primary term.[1]

FAILURE TO MAINTAIN PRODUCTION OR TO PAY PRODUCTION ROYALTY
After the well was made productive and before it was placed on the pipeline, Marshall mailed three checks for $12.50 each as shut-in royalty payments to the original plaintiff. Huhn refused to accept or to cash the shut-in royalty checks. Huhn's correspondence and writings on checks returned to Marshall show that Huhn was dissatisfied with the lease and contested its validity as soon as it was known that the well was made productive. Huhn's position was that the production unit for the well should not encompass 640 acres, but only the leased property of slightly less than 160 acres. Huhn also refused to cash some of the production royalty checks which were mailed to him by Marshall's assignee and would not sign a division order specifying his royalty interest in the unit, all because of his contentions against the size of the unit and the validity of the lease.
The lower court expressly noted in its written opinion that this was the "real reason" Huhn was seeking cancellation of the lease.
Marshall's assignee, White Shield, paid or attempted to pay production royalty periodically to Huhn through May of 1973. From February until May, 1973, the compressor and other equipment near the well site became the subject of repeated vandalism by persons unknown. Eventually Marshall caused the manually operated valves at the well site to be immobilized in an attempt to avoid deliberate interference with production. The well was still productive but because of the vandalism, the production equipment was not operating for about three months to force the gas into the highpressure marketing pipeline. After complaints to local law enforcement authorities by Marshall, and a complaint to Huhn's attorney, the vandalism ceased and repeated repairs were no longer necessary. The flow of gas into the marketing pipeline resumed in May, 1973. On June 5, 1973, Marshall formally reacquired the fractional interest earlier assigned to White Shield.
Paragraph 12 of the lease contemplates that things beyond the control of the lessee, such as vandalism and deliberate interference with production, will not cause automatic termination or forfeiture of the lease.[2]
*565 Paragraph 5 of the lease provides in part that if production should cease from any cause, the lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter. Marshall and its assignee repeatedly made attempts to protect against vandalism and to restore and repair the compressor and other production equipment for about three months. Without a compressor to force the gas into the pipeline which was of greater pressure than the well, the gas simply could not be marketed during this time. There was no cessation of production and no necessity for drilling or "reworking" of the well in the technical sense of paragraph 5 because the well was capable of producing. See House v. Tidewater Oil Company, 219 So.2d 616 (La.App.3d Cir. 1969).
Under our interpretation of the lease and contrary to plaintiffs' contentions, we hold paragraph 5 inapplicable because production does not cease when production equipment is damaged by vandalism and a reasonably diligent and timely effort is made by the lessee to protect against vandalism and to repair the equipment necessary to market the gas.
Once White Shield formally reassigned its interest in the lease back to Marshall on June 5, 1973, White Shield delayed for some six months in getting all of its production and royalty payment records to Marshall. When Marshall acquired these records in January, 1974, Marshall was aware of its experience with Huhn in 1970 when Huhn returned and refused to cash shut-in royalty checks. Marshall became aware from writings in Huhn's White Shield file that Huhn had refused to cash production royalty checks sent to him by White Shield and that his position as to invalidity of the lease and the size of the production unit had not changed. Marshall consulted with its attorney about the matter and on the attorney's advice, Marshall mailed to Huhn on July 12, 1974, a check for production royalty ($188) which had accrued to his account since Marshall formally acquired White Shield's interest. Huhn did not cash Marshall's check.
The uncashed checks from Marshall (including $37.50 for shut-in royalty) and from White Shield for production royalty which were sent to Huhn and held or returned by him totaled less than $400, according to testimony of Marshall's vice-president at the trial.
On August 4, 1974, Huhn's attorney made written demand on Marshall for cancellation on the sole ground that the well had not "produced" for more than 60 days as provided in paragraph 5 of the lease during the four-month period prior to June, 1973. This is the period of time the vandalism discussed above was occurring. Huhn's demand letter in August, 1974, made no mention of Marshall's failure to pay production royalty.
Suit was filed on August 21, 1974, seeking cancellation on the grounds of (1) failure to drill within the primary term; (2) failure to pay shut-in royalty; and (3) failure to produce for the four-month period in 1973. No complaint about failure to pay production royalty was made in the original petition. On October 24, 1974, by supplemental petition filed that date, Huhn first asserted Marshall's failure to pay production royalty for the thirteen-month period *566 beginning June 5, 1973. Before the case was tried on June 17, 1975, Huhn died.
The Supreme Court in Wilson v. Sun Oil Company, 290 So.2d 844, 847 (La.1973) succinctly summarized the law in such cases:
"Our jurisprudence has developed the rule that failure to pay production royalties under an oil and gas lease for any appreciable length of time without justification amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default . . . (citations omitted)
"However, in cases where the failure to pay production royalties is justified under the facts and circumstances, the breach is considered passive, requiring a putting in default . . . (citations omitted)."
Among the cases cited in Wilson was Alvord v. Sun Oil Company, 271 So.2d 561 (La.App.2d Cir. 1972) writ refused. There we had occasion to consider and analyze the several cases which had considered the effect of the lessee's failure to pay production royalty. We held in Alvord, the sublessee's failure to pay production royalty for more than twelve months was not an active breach by the sublessee of the lease contract under the circumstances there presented.
Cases which have considered the issue indicate that there are a number of factors to be weighed in determining whether the failure to pay royalties was justified so as not to constitute an active breach of the lease. These factors include (1) length of time;[3] (2) the amount involved;[4] (3) special circumstances outside the control of the lessee;[5] (4) motive of the lessee (such as coercion to obtain unitization or division order agreements from lessor);[6] (5) when and under what circumstances and frequency the lessor did or did not make inquiries or demands for the royalty;[7] (6) whether the person to whom royalty was due was knowledgeable about the industry or was on relatively unequal footing with lessee.[8] One factor, of course, does not control but each factor is to be weighed according to the circumstances of the individual case.
Here, we think it important that Huhn returned or refused to cash checks for shutin and production royalty sent to him by Marshall and White Shield for the period prior to June 5, 1973; that the amount involved since June 5, 1973, was relatively small; that as soon as Marshall became aware that Huhn had not signed a division order for White Shield it contacted its attorney, followed the attorney's advice, and mailed or tendered the production royalty more than three months before Huhn made any inquiry or demand about it; and that Huhn's principal complaint during the entire time from initial production at least until Huhn's supplemental petition was filed, concerned the size of the unit and whether the well was "drilled" during the six-month primary term.
Under these circumstances we hold Marshall's failure to timely pay production royalty not to constitute an active breach of its lease obligation.

PROCEDURAL QUESTIONS
Appellants contend the lower court should not have allowed, because of timely objection, one of Marshall's employees to testify as to the extent of the vandalism which caused Marshall not to be able to market gas from February through May of 1973. Appellants argue that the cause of *567 nonproduction is an affirmative defense under Article 1005, LSA-C.C.P. which was not specifically pleaded and that the testimony should not have been allowed over their objection. They also argue that the employee should not have been allowed to testify because his name was not included in an answer to an interrogatory asking for the name and address of all witnesses Marshall planned to use at the trial.
Other employees or principals of Marshall testified regarding the vandalism and a complaint or inquiry made about the vandalism to law enforcement officials and to plaintiffs' attorney. When plaintiffs' attorney objected to testimony by other employees on hearsay grounds and was sustained, Marshall's attorney then called to the stand the employee who was in the field and periodically observed the effect of the vandalism. Under these circumstances we find no abuse of the discretion afforded the lower court in allowing this particular employee to testify.
LSA-C.C.P. Art. 1005 requires that the answer set forth certain enumerated affirmative defenses, ". . . and any other matter constituting an affirmative defense." In effect, plaintiffs' counsel is contending that a general denial by defendant limits the defendant's evidence solely to matters which plaintiff has pleaded.
As we have discussed and found, production from this well did not cease within the intendment of paragraph 5 of the lease simply because no gas was marketed during the period of vandalism. Plaintiff alleged, and Marshall denied, cessation of "production" during the period in question.
Whether the well was "producing" during the time in question was an issue under the pleadings and it was not error for the lower court to allow testimony on this issue. Special allegations or affirmative defenses in the answer are not necessary to authorize the introduction of evidence, the direct tendency of which is to disprove what plaintiff alleges. See Williams v. Fisher, 79 So.2d 127, 128 (La.App. 1st Cir. 1955). Whether the evidence was within the general issues raised by the pleadings is usually a matter which is left to the discretion of the trial court. See Mouledous v. Poirier, 221 So.2d 291 (La.App. 4th Cir. 1971).
Under our Code of Civil Procedure, plaintiffs had the opportunity to call rebuttal witnesses to rebut defendant's evidence in this respect. The lower court had the discretion but was not requested, to allow plaintiffs some delay or continuance for the purpose of obtaining rebuttal evidence or rebuttal witnesses. See Williams v. Garner, 268 So.2d 56 (La.App. 1st Cir. 1972). We find no procedural error in the action of the lower court.

CONCLUSION
At appellant's costs, the judgment is
AFFIRMED.
NOTES
[1] Paragraph four of this lease provides that if "operations for drilling are not commenced" on or before one year from the date of the lease, the lease shall terminate unless lessee pays delay rentals to lessor. Blanks are provided in this paragraph for the amount to be paid and for the name and location of a bank to receive payment for lessor's credit. The blanks in this paragraph were not completed obviously because the primary term of the lease was only six months and the parties did not intend that payment of delay rentals would extend the lease during the primary term without drilling. Cases which have construed the language regarding commencement of drilling operations (as distinguished from "engaged in drilling operations") have consistently held that acts in preparation for drilling were sufficient to satisfy the requirement that drilling operations commence. See Crye v. Giles, 200 So. 155 (La.App.2d Cir. 1941) and Texas Co. v. Leach, 219 La. 613, 53 So.2d 786 (1951).
[2] These things are covered by the term "Force Majeure" in paragraph 12:

"12(a) . . . `Force Majeure' as used herein shall mean . . . control by governmental authority . . . war . . . delay in obtaining materials or equipment; Acts of God; insurrection; flood; strike, or other thing beyond the control of lessee.
"(b) If by reason of Force Majeure . . . lessee is prevented from . . . producing. . . then while so prevented . . . this lease shall not be subject to cancellation for failure of lessee . . . to produce . . .
"(c) If . . . while this lease is in force, lessee cannot maintain same in effect because prevented by Force Majeure from fulfilling the particular requirement (operations on or continued production from the leased premises, as the case may be) . . . then while so prevented and for six months thereafter this lease shall nevertheless continue in effect; and if within such six months lessee . . . resumes production from the leased premises . . . this lease shall continue in effect thereafter as though Force Majeure had not intervened . . .
"(d) The specification of causes of Force Majeure herein enumerated shall not exclude other causes from consideration in determining whether lessee has used reasonable diligence wherever required in fulfilling any obligations or conditions of this lease, express or implied, and any delay of not more than six months after termination of Force Majeure shall be deemed justified." (Emphasis supplied)
[3] Bailey v. Meadows, 130 So.2d 501 (La.App.2d Cir. 1961), cert, refused.
[4] Herbert v. Sun Oil Company, 223 So.2d 897 (La.App.3d Cir. 1969).
[5] Bailey v. Meadows, supra.
[6] Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956).
[7] Pierce v. Atlantic Refining Company, 140 So.2d 19 (La.App.3d Cir. 1962), cert, denied.
[8] Fontenot v. Sunray Mid-Continent Oil Company, 197 So.2d 715 (La.App.3d Cir. 1967), cert, denied.