437 So.2d 940 (1983)
BASS ENTERPRISES PRODUCTION CO., Plaintiff-Appellee,
v.
Paul C. KIENE, et al., Defendant-Appellant.
No. 15,549-CA.
Court of Appeal of Louisiana, Second Circuit.
August 15, 1983.
*941 Hargrove, Guyton, Ramey & Barlow, Shreveport by David L. Smelley, for plaintiff-appellee.
Robert J. Moffatt and Frederic L. Miller, Shreveport, for defendant-appellant.
Rabun & Post by Armand F. Rabun, Farmerville, for defendant-appellee.
Before JASPER E. JONES, FRED W. JONES and NORRIS, JJ.
NORRIS, Judge.
This appeal involves a concursus proceeding brought by Bass Enterprises Production Company, against defendants, Paul C. Kiene and Minnie Lee Graves, both of whom answered the proceeding, to determine who is entitled to a deposited sum representing production proceeds attributable to a royalty interest in gas and condensate produced from a unit well located in the Southwest Quarter of the Southwest Quarter of Section 16, Township 20 North, Range 3 West, Lincoln Parish, Louisiana, for the Cotton Valley Formation, Reservoir A, Hico-Knowles Field. Bass is the operator of the unit well which is presently producing gas and condensate in commercial quantities.
The threshold issue presented by this appeal is: whether operations conducted in connection with a well drilled in 1974 and later plugged in 1975 on a unit, including a portion of the servitude tract but not on the servitude tract itself, constitute sufficient good faith operations for the discovery and production of minerals so as to interrupt the running of nonuse prescription against a mineral servitude created in 1968? The trial court answered affirmatively, and finding no error in the ruling, we affirm.
The following facts are undisputed. On November 20, 1968, Minnie Lee Graves and her husband, W.F. Graves, now deceased, sold the following described property to Paul C. Kiene reserving unto themselves one-half of the minerals:
"SW ¼ of SW ¼ of Section 16; S½ of SE ¼, Section 17, less and except that portion of the SW ¼ of SE¼ of Section 17 lying and being South and West of the Dubach-Hico Road, Township 20 North, Range 3 West, Lincoln Parish, Louisiana, containing 110 acres, more or less, together *942 with all improvements" (hereinafter sometimes referred to as the "servitude tract").
By instrument dated June 21, 1974, Mr. and Mrs. Graves granted an oil, gas and mineral lease to Thomas A. Durham with a primary term of five years covering land including the SW ¼ of SW ¼ of Section 16, Township 20 North, Range 3 West, Lincoln Parish, Louisiana. On August 19, 1974, Paul C. Kiene granted an oil, gas and sulphur lease to Bradco Oil & Gas Company with a primary term of five years covering land including the SW ¼ of SW ¼ of Section 16, Township 20 North, Range 3 West, Lincoln Parish, Louisiana.
Effective December 1, 1953, Louisiana Department of Conservation Order No. 137-C-2 created the entirety of Section 16, Township 20 North, Range 3 West, Lincoln Parish, Louisiana, as a drilling unit for the McFearin Sand in the Hico-Knowles Field, Lincoln Parish, Louisiana and provided that the unit was subject to the field rules set forth in Louisiana Department of Conservation Order No. 137-C, effective January 9, 1953. A portion of the servitude tract (SW ¼ of SW ¼ of Section 16, Township 20 North, Range 3 West) was included in this drilling unit.
A well was never physically located on any part of the servitude tract drilled for the exploration of hydrocarbons between November 20, 1968 and November 20, 1978. However, on or about October 24, 1974, Bass applied to the Louisiana Department of Conservation for a permit to drill the Paul C. Kiene No. 1 Well to the Smackover Formation at a proposed total depth of 11,500 feet. The drilling of this well was a good faith operation for the discovery and production of oil, gas and other minerals, that is drilling to a depth at which there was reasonable expectation of commercial production. Located on the SW ¼ of SE ¼ of Section 16, Township 20 North, Range 3 West, Lincoln Parish, Louisiana, the Kiene No. 1 Well was spudded by Bass on November 11, 1974 and drilled by Bass to a depth of 10,746 feet. On or about January 14, 1975, CSC/IMC Exploration took over operations of the well from Bass and continued drilling to a total depth of 11,520 feet, which was reached on or about February 9, 1975. This well was commercially unproductive of hydrocarbons from the Smackover Formation and on or about February 10, 1975, was plugged back to a depth of approximately 9,084 feet. On or about February 12, 1975, casing was run in the Kiene No. 1 Well to a depth of 9,075 feet in order to facilitate testing of various intervals in the well above the Smackover Formation. Thereafter, it was determined that the Kiene No. 1 Well was not capable of commercial production of hydrocarbons from any zone, and the well was plugged and abandoned on or about July 15, 1975.
By Louisiana Office of Conservation Order No. 137-X, effective June 21, 1978, as amended by Order No. 137-X-1, effective December 12, 1978, a drilling and production unit comprising the entirety of Section 16, Township 20 North, Range 3 West, Lincoln Parish, Louisiana, was established for the exploration for and production of gas and condensate from the Cotton Valley Formation, Reservoir A, in the Hico-Knowles Field, Lincoln Parish, Louisiana. A portion of the servitude tract, particularly the SW ¼ of SW ¼ of Section 16, Township 20 North, Range 3 West, is included in this unit. On or about May 6, 1979, Bass spudded the Etta H. Colvin No. 3 Well on the unit. This well has been completed and is presently producing gas and condensate in commercial quantities from the Cotton Valley Formation, Reservoir A, Hico-Knowles Field, Lincoln Parish, Louisiana. The Colvin No. 3 Well is the unit well and Bass is its operator. The portion of the proceeds of production from this well amounting to a .00390786 royalty interest attributable to one half of the oil, gas and other minerals in and under the SW ¼ of SW ¼ of Section 16, Township 20 North, Range 3 West, Lincoln Parish, Louisiana is the disputed amount arising from the conflicting claims of Kiene and Graves. The competing claims arise from a dispute as to whether the mineral servitude created in the sale from W.F. Graves and Minnie Lee Graves to Paul C. Kiene on November 20, *943 1968, has lapsed by ten year liberative prescription.
In addition to the aforementioned facts obtained from the stipulations of the parties, the following findings of fact were made by the trial court after considering testimony and numerous exhibits. During the time that Bass operated the Kiene No. 1 Well, prior to transferring it to CSC/IMC, the following logs were run on the well which evaluated the McFearin Sand: (1) dual induction lateral log; (2) density neutron log; (3) micro log and (4) mud log. These logs were run to gather information regarding the potential of the McFearin Sand while the well was initially being drilled to the Smackover Sand. After taking over the operations of the Kiene No. 1 Well, CSC/IMC engaged the services of an independent oil and gas consulting firm to evaluate the information previously obtained to determine the productive possibilities of and the procedure and cost to test the McFearin Sand in the well. It was the opinion of these consultants that the McFearin Sand merited testing. Based on these recommendations, on March 31, 1975, CSC/IMC applied to the Louisiana Office of Conservation for a work permit to perforate and acidize the McFearin Sand in the Kiene No. 1 Well. The permit was granted, the sand was perforated and acidized between April 5-6, 1981, and the procedure failed to establish commercial production from the McFearin Sand. On June 5, 1975, another work permit was granted to further test the McFearin Sand in the Kiene No. 1 Well. The well was then tested by fracing the sand; however, this procedure also failed to establish commercial production of hydrocarbons from this sand in the well. The well was plugged and abandoned on July 15, 1975. All of the tests on the McFearin Sand in the well were for the purpose of establishing the commercial production of gas and condensate from the well. Had the testing resulted in a determination that the well was capable of commercial production from the McFearin Sand, then an exceptional location could have, and more probably than not, would have been granted for the well to produce from this sand. All of these factual findings are supported by the record.
Based on the foregoing, the trial court found that the evidence reflected a good faith operation and a bona fide attempt to obtain production from the McFearin Sand by the operations connected with the Kiene No. 1 Well which served to interrupt the running of prescription on that portion of the servitude tract located within the McFearin unit.
Kiene appeals contending that the trial court erred:
(1) In overruling the objection made at trial by Counsel for Appellant, Paul C. Kiene, to the introduction of any evidence concerning an alleged test of the McFearin Sand in the Kiene No. 1 Well as either being outside the scope of the pleadings of Bass Enterprises Production Co. or, alternatively, a collateral attack on the orders of the Commissioner of Conservation, as contained in Order No. 137-C and 137-C-2.
(2) In finding that the operations conducted by Bass Enterprises and CSC/IMC were good faith unit operations pursuant to Department of Conservation Order 137-C.
(3) In finding that operations on the Kiene No. 1 Well, a well located off the servitude premises, were sufficient to interrupt liberative prescription running against the Graves Servitude.
(4) In finding Minnie Lee Graves Servitude to be maintained and, accordingly, Minnie Lee Graves to be the owner of the royalties at stake in this concursus proceedings.
In connection with the first assignment of error, Kiene argues that the testimony of two witnesses, Larry Hoover and Ray Waterman, regarding the testing of the McFearin Sand is outside the scope of the pleadings because this issue was only raised within the answer and reconventional demand of Graves which was severed in an earlier pre-trial ruling and there was no testimony at the trial which could have expanded the pleadings. In the alternative, *944 Kiene contends that the testimony is inadmissible because it is a collateral attack on the orders of the Commissioner of Conservation which have the force of law.
Our review of the pleadings compels us to conclude that the entire thrust of this concursus proceeding was to determine whether the mineral servitude created in the deed from Graves to Kiene had lapsed by ten year prescription or had been maintained by good faith drilling operations sufficient to interrupt prescription on the portion of the servitude tract located within the McFearin Unit. This is obvious from the language of the petition; therefore, the introduction of this evidence did not serve as an expansion of the pleadings. Based on our system of fact pleading as contained within the Code of Civil Procedure, [La.C. C.P. Arts. 854, 891, 1003 and 1004], there are sufficient allegations contained within the record to support the trial court's finding that this testimony was admissible. Furthermore, a trial court is given discretion in determining whether to allow evidence objected to on the ground that it is not within the scope of the pleadings. Huhn v. Marshall Exploration, Inc., 337 So.2d 561 (La.App. 2d Cir.1976). There was no abuse of that discretion in allowing this testimony.
Kiene's argument that the testimony is a prohibited collateral attack on Orders of the Commissioner of Conservation is likewise without merit. A reading of the orders themselves reveals that the well location provisions contained therein are subject to variances when the proper procedures are followed. It is further apparent from the testimony of the representative of the Office of Conservation that exceptional locations can be and are approved after a hearing either before or after a particular well is drilled. This witness further testified that he had never known of such a request to be denied when a well had been tested and found to be commercially productive. Additionally, the record contains two permits obtained from the Office of Conservation specifically permitting the testing done in the McFearin Sand. These orders are equally applicable to the instant case. The evidence admitted over the objection is directly material to and connected with the testing done on the McFearin Sand in accordance with the permits issued by the Office of Conservation. Based on all of the circumstances of this case, we find no prohibited collateral attack on an order issued by the Commissioner of Conservation. Compare Pierce v. Goldking Properties, Inc., 396 So.2d 528 (La.App. 3d Cir.1981); Brown v. Alice-Sidney Oil Co., 343 So.2d 745; United Gas Pipeline Co. v. Watson Oil Corp., 306 So.2d 731 (La.1975); Simmons v. Pure Oil Co., 241 La. 592, 129 So.2d 786 (1961).
Accordingly, the trial court properly allowed the objected to testimony.
The remaining three assignments of error can be considered simultaneously because their main thrust is directed to the argument that because the Kiene Well was initially primarily intended to test the Smackover Sand rather than the McFearin Sand and because the well was not located on the servitude tract itself that it could not interrupt prescription based on the activities engaged in to test the McFearin Sand.
La.R.S. 31:27 provides in pertinent part:
A mineral servitude is extinguished by:
(1) prescription resulting from nonuse for ten years;
* * * * * *
La.R.S. 31:28 provides:
Prescription of nonuse of a mineral servitude commences from the date on which it is created.
La.R.S. 31:29 provides:
The prescription of nonuse running against a mineral servitude is interrupted by good faith operations for the discovery and production of minerals. By good faith is meant that the operations must be
(1) commenced with reasonable expectation of discovering and producing minerals in paying quantities at a particular point or depth.

*945 (2) continued at the site chosen to that point or depth, and
(3) conducted in such a manner that they constitute a single operation although actual drilling or mining is not conducted at all times.
La.R.S. 31:33 provides:
Operations conducted on land other than that burdened by a mineral servitude and constituting part of a conventional or compulsory unit that includes only a part of the land burdened by the servitude will, if otherwise sufficient to interrupt prescription according to Articles 29 through 32, interrupt prescription only as to that portion of the tract burdened by the servitude included in the unit provided such operations are for the discovery and production of minerals from the unitized sand or sands.
The question of whether the operations engaged in in connection with a particular well constitute a use of the servitude in such a manner as to interrupt the running of prescription is a question of fact dependent upon the particular circumstances under which the operations were conducted and the factor of good or bad faith on the part of the operators is inextricably connected with, although perhaps not wholly decisive of, the factual situation presented. Kellogg Bros. Inc. v. Singer Mfg. Co., 131 So.2d 578 (La.App. 2d Cir.1961).
In the instant case, there is no issue raised as to the good faith of Bass Enterprises in its initial drilling of the Kiene No. 1 Well to the Smackover Formation. However, Kiene does dispute that the operations by Bass and CSC/IMC on this well in the closing days of 1974 and the first half of 1975 were good faith operations directed toward the discovery and production of hydrocarbons from the shallower unitized McFearin Sand. In essence, Kiene argues that the well was commenced as a wildcat well to test the Smackover Formation and that no objective intent can be found to tie the well, from the time of commencement through drilling to total depth in the Smackover Formation, to any type of test of the McFearin Sand. Therefore, it is contended that such operations were clearly not bona fide unit operations as required by Article 33 of the Mineral Code.
In support of this argument, Kiene cites Matlock Oil Corp. v. Gerard, 263 So.2d 413 (La.App. 2d Cir.1972). In Matlock, this court was faced with the identical issue presented in the instant case. There, a mineral servitude present on land in the SW ¼ of Section 33, Township 22 North, Range 4 West in Claiborne Parish was kept alive by a producing well on the servitude tract until the well was physically plugged and abandoned in May, 1960. The Matlock-Fuller No. 1 Well had been drilled in 1969 within the geographical confines of the Lower Hosston Formation Unit created by a Conservation Order on February 1, 1966. This unit contained the servitude tracts within its confines but the Fuller No. 1 Well was located off the servitude tracts. In January, 1969, the Lower Hosston Formation was penetrated by the well bore of the Fuller No. 1 Well; however, no tests were performed with respect to the Lower Hosston Formation. In Matlock, appellants contended that the mere act of drilling the well through the Lower Hosston Formation on the drilling and production unit established for that formation interrupted the running of prescription and preserved the mineral servitudes in question which were located within the unit. However, in Matlock, this court determined that "good faith" drilling means a bona fide attempt to obtain production and then sought to determine whether appellants had made a bona fide attempt to obtain production from the unitized Lower Hosston Formation thereby exercising their servitudes as to other tracts within the unit before liberative prescription had run. The permit obtained in Matlock was for an oil well to be drilled to the Smackover Formation rather than a permit to drill for minerals. There was no evidence whatsoever that any procedures were utilized to evaluate the productive possibilities of the Lower Hosston Formation on the way to the Smackover Formation. Testimony in Matlock was to the effect that the usual practice was to install a mud *946 logging unit several days in advance of the time a prospective formation was encountered. There, the mud logging unit was not installed until the drilling had almost passed through the Lower Hosston Formation. There was no inquiry made regarding the production of Lower Hosston wells even though there was a well nearby which had produced from that formation. The daily drilling report was not begun until after the drilling had completely passed through the Lower Hosston Formation and that report showed conclusively that the real testing of the well was conducted after the Lower Hosston Formation had been traversed. Based upon these particular factual findings, the court concluded that appellants simply never intended to test or actually tested the Lower Hosston Formation through this particular well; therefore, there was not good faith drilling as to the unit established for drilling and production from the Lower Hosston Formation. In other words, the record did not support a finding that the operations off the servitude tracts in connection with this particular well were directed toward discovery and production from the unitized Lower Hosston Formation. Thus, there was no use of the servitude within ten years sufficient to interrupt the running of liberative prescription.
In the instant case, while Bass was the operator of the Kiene No. 1 Well and while drilling through the McFearin Sand, the following logs were run in the well to gather information concerning the McFearin Sand: (1) dual induction lateral log; (2) density neutron log; (3) micro log; and (4) mud logs. This information is useful and necessary in evaluating the potential of a sand as it relates to the production of hydrocarbons. Additionally, a formation test was run in the McFearin Sand before the well reached its total depth in the Smackover Sand. Thereafter, CSC/IMC took over as operator of this well and completed the well to the proposed depth in the Smackover Formation. Upon finding that the well was commercially unproductive of hydrocarbons in the Smackover Formation, the well was plugged back to a depth of 9,075 feet in order to facilitate testing at higher intervals, including the McFearin Sand, in an attempt to obtain commercial production of hydrocarbons from the Kiene No. 1 Well. CSC/IMC engaged the services of a firm of consulting petroleum engineers and geologists to evaluate the information obtained on the McFearin Sand and to investigate the productive possibilities of that formation. Based upon their recommendation that the information created a reasonable expectation of discovering and producing gas in paying quantities and thus that the McFearin Sand merited further testing at a projected cost of $23,775, CSC/IMC applied for and received a permit from the Louisiana Office of Conservation to perforate and acidize the McFearin Sand in the well. Thereafter, another permit was obtained to further test the sand by fracing which was also completed. Finally, it was determined that the well was commercially unproductive and it was plugged.
This case is clearly factually distinguishable from Matlock. The facts as evidenced in Matlock reveal that the only contact with the Lower Hosston Formation was drilling through it and clearly reflect a lack of intent or effort at any time during the continuous operation to obtain production from the Lower Hosston Formation through the drilling of the Matlock Fuller No. 1 Well. On the other hand, the facts as evidenced in the instant case reflect bona fide, good faith testing of the McFearin Sand, not only at the time it was initially encountered but also when the well was plugged back to a depth sufficient for further testing. The evidence reveals one continuous operation begun in good faith primarily for the discovery and production of minerals from the Smackover Formation but also evidencing an intent during that continuous operation to obtain information from and to actually test the McFearin Sand. The evidence further reveals that the operators of the well had information regarding the McFearin Sand that created a reasonable expectation of discovering and producing minerals in paying quantities *947 from that depth when they actually tested the sand. La.R.S. 31:29.
Accordingly, the operations conducted in connection with the drilling of the Kiene No. 1 Well constituted a bona fide, good faith testing of the McFearin Sand in an effort to obtain production therefrom and these operations were sufficient under La. R.S. 31:29 to interrupt the running of the ten year liberative prescription. Because the operations on the unitized tract but off the servitude tract were sufficient to interrupt prescription under La.R.S. 31:29, they interrupted prescription only as to that portion of the servitude tract included within the unit. La.R.S. 31:33. Therefore, with respect to that part of the Graves servitude which is situated within the McFearin Sand Unit for Section 16 established by Office of Conservation Order No. 137-C-2, prescription was interrupted, and all rights of Minnie Lee Graves under the servitude granted in the deed of November 20, 1968, were in full force and effect at the time of the drilling of the Colvin No. 3 Well insofar as they affected that portion of the servitude tract included within the McFearin Unit.
Accordingly, the judgment of the trial court is affirmed at the cost of appellant.