SEXTON, Judge.
This appeal presents the narrow issue of whether a mineral lessee’s action in recom-pleting a well at a shallower formation constituted a single operation with the initial drilling so as to be good faith operations sufficient to interrupt the ten year liberative prescription of non-use established for mineral servitudes.
Plaintiffs in this cause are the surviving children and grandchildren of Frankie 0. Lester Malone and William Madison Malone. In the succession of Frankie 0. Lester Malone, plaintiffs were placed in possession of certain immovable property. Subsequently, by deeds dated October 2, 1970, plaintiffs transferred all of their interest in the property to Harold Joseph I. Malone, reserving, however, an undivided one-half interest in the minerals. On January 6,1972, Harold Joseph I. Malone, transferred all of his interests, both surface and mineral, to Mrs. Mary G. Hudson, who is made a defendant in this cause.
Subsequently, plaintiffs leased their mineral interests to Celt Oil, Inc. Certain interests in these leases were assigned to defendants, American Natural Gas Production Company, Sun Oil Company, and Pettit Engineering, Inc. Later, on April 2, 1980, and April 30,1980, Celt Oil, Inc. and Cotton Petroleum Corp., also a defendant, entered into a farm out agreement.
By an operating agreement dated July 8, 1980 between Crystal Oil Company as operator, and Cotton Petroleum Corp. and W.M. Beasley, Jr., as non-operators, Crystal Oil Company began development.
On September 9, 1980, Crystal Oil spud-ded in International Paper Company B No. 1 well (hereinafter IPCO B-l) approximately one month before the accrual of prescription.[1] The drill site was located on property unitized for the Haynesville interval with the property sold by plaintiffs with the reservation of a mineral servitude.
According to the drilling report, the well was drilled from September 11, 1980 to October 24, 1980 when the well reached total depth. The well was perforated on November 8, 1980 and was placed into production as a commercial producer from the Smackover interval on November 12, 1980. On March 17, 1981, the tract on which IPCO B-l was situated was unitized in a compulsory unit for the Smackover interval. The production from the well began to dwindle and ceased sometime in March, 1981. Thereafter, the well was plugged back to the Haynesville sand and after the conclusion of recompletion work, produced from that formation beginning on April 24, 1981.
Plaintiffs filed suit for the recognition of their mineral servitude and an accounting and payment of royalties, alleging that the drilling of the IPCO B-l well approximately a month before the accrual of the libera-tive prescription of non-use, was a sufficient good faith operation to interrupt prescription.
In a written opinion following trial, the trial court recognized that Crystal Oil was aware of the paying potential of the Haynesville formation at the time of spud-ding and fully expected to plug back to the Haynesville should the Smackover formation play out or not be productive. However, the trial court held that this factor, including certain, logging tests conducted on the Haynesville sand during the process of putting the well on line as a Smackover producer and the later recompletion at the Haynesville, did not amount to one continuous operation under Article 29 of the Min *147 eral Code. The trial court found that the production completed from the Smackover formation ended that particular operation and that the later completion from the Haynesville formation was a separate operation. Accordingly, the trial court rendered judgment in favor of the defendants.
Plaintiffs argue on appeal that there were good faith operations sufficient to interrupt prescription in that at the time IPCO B-l was spudded in, the well site was unitized with the property for the Haynesville formation. According to LSA-R.S. 31:33,[2] that operation, if it met with the requisites for interruption of prescription, would interrupt prescription only as to that portion of the tract burdened by the servitude included in the unit provided such operations are for the discovery and production of minerals from the unitized zone.
In opposition, defendants assert that the well was commenced as a Smackover well and that no objective intent can be found to tie the well from the point of spudding to completion at total depth to any type of test of the Haynesville sand. Therefore, defendants assert that the operations did not meet the criteria established in LSA-R.S. 31:29 for interruption of prescription.
LSA-R.S. 31:29 provides:
§ 29. How prescription of nonuse is interrupted
The prescription of nonuse running against a mineral servitude is interrupted by good faith operations for the discovery and production of minerals. By good faith is meant that the operations must be
(1) commenced with reasonable expectation of discovering and producing minerals in paying quantities at a particular point or depth,
(2) continued at the site chosen to that point or depth, and
(3)conducted in such a manner that they constitute a single operation although actual drilling or mining is not conducted at all times.
As the readactor’s comment indicates, this article is simply a broad restatement of the existing jurisprudence. Thus, this court’s definition of “good faith drilling” as a “bona fide attempt to obtain production,” in Matlock Oil Corp. v. Gerard, 263 So.2d 413 (La.App.2d Cir.1972), is noteworthy. Matlock held that the mere act of drilling through a shallower sand, without the manifestation of an intent to obtain production was not sufficient operation to interrupt the running of the liberative prescription of non-use. The facts and holding of Matlock were succinctly stated by this court in Bass Enterprises Production Company v. Kiene, 437 So.2d 940 (La.App.2d Cir.1983) as follows:
In Matlock, this court was faced with the identical issue presented in the instant case. There, a mineral servitude present on land in the SW ¾⅛ of Section 33, Township 22 North, Range 4 West in Claiborne Parish was kept alive by a producing well on the servitude tract until the well was physically plugged and abandoned in May, 1960. The Matlock-Fuller No. 1 Well had been drilled in 1969 within the geographical confines of the Lower Hosston Formation Unit created by a Conservation Order on February 1, 1966. This unit contained the servitude tracts within its confines but the Fuller No. 1 Well was located off the servitude tracts. In January, 1969, the Lower Hosston Formation was penetrated by the well bore of the Fuller No. 1 Well; however, no tests were performed with respect to the Lower Hosston Formation. In Mat-lock, appellants contended that the mere act of drilling the well through the *148 Lower Hosston Formation on the drilling and production unit established for that formation interrupted the running of prescription and preserved the mineral servitudes in question which were located within the unit. However, in Mat-lock, this court determined that “good faith” drilling means a bona fide attempt to obtain production and then sought to determine whether appellants had made a bona fide attempt to obtain production from the unitized Lower Hosston Formation thereby exercising their servitudes as to other tracts within the unit before liberative prescription had run. The permit obtained in Matlock was for an oil well to be drilled to the Smackover Formation rather than a permit to drill for minerals. There was no evidence whatsoever that any procedures were utilized to evaluate the productive possibilities of the Lower Hosston Formation on the way to the Smackover Formation. Testimony in Matlock was to the effect that the usual practice was to install a mud logging unit several days in advance of the time a prospective formation was encountered. There, the mud logging unit was not installed until the drilling had almost passed through the Lower Hos-ston Formation. There was no inquiry made regarding the production of Lower Hosston wells even though there was a well nearby which had produced from that formation. The daily drilling report was not begun until after the drilling had completely passed through the Lower Hosston Formation and that report showed conclusively that the real testing of the well was conducted after the Lower Hosston Formation had been traversed. Based upon these particular factual findings, the court concluded that appellants simply never intended to test or actually tested the Lower Hosston Formation through this particular well; therefore, there was not good faith drilling as to the unit established for drilling and production from the Lower Hosston Formation. In other words, the record did not support a finding that the operations off the servitude tracts in connection with this particular well were directed toward discovery and production from the unitized Lower Hosston Formation. Thus, there was no use of the servitude within ten years sufficient to interrupt the running of liberative prescription.
However, this court distinguished Mat-lock in Bass Enterprises Production Company v. Kiene, supra. In Bass, a good faith attempt to obtain production from the shallower sand during the period of the servitude was found. In the Bass case, the servitude was created in November of 1968. A well intended for the Smackover formation was spudded in November of 1974. In drilling through the McFearin sand at issue on the way to the Smackover, the following logs were run, to-wit: (a) a dual induction lateral log, (b) a density neutron log, (c) a micro log, and (d) mud logs. The operation proved unproductive at the Smackover and the well was immediately plugged back to the McFearin sand in February of 1975. Casing was set to that sand shortly thereafter and the sand was perforated and acidized in early April to no avail. Another attempt was made to bring the well on line with fracturing (“frac’ing”) in July of 1975. This procedure also failed to establish commercial production and the well was plugged and abandoned in July of 1975.
The Bass court found that the extensive efforts to obtain production from the McFearin sand distinguished that case from Matlock and found that the evidence in Bass showed a continuous good faith operation to obtain production from the McFearin sand.
The record in the instant case, in contrast, shows that after total depth was reached on October 24, 1980, a dual induction log, a formation density log, and a compensated neutron log were run on October 25. Furthermore, from November 1 to November 2, 1980, a gamma ray log and a cement bond log, which are both run inside the casing, were performed. As we appreciate it, these logs also evaluated the shallower Haynesville formation. Besides the *149 aforementioned electrical logs, mud logs were also performed.
Mr. Eobert Bassett, the Crystal Oil geologist on this well, testified that the well was drilled to the Smackover formation first because it was the deepest formation and because if the well produced from the Smackover lime, the production would probably be better at that interval than in any other formation. He stated that while several geological formations indicated possibilities for production in IPCO B-l, the Smackover was the primary objective of the well.
Mr. Val Quinn, an independent log analyst who consulted with Crystal Oil on this well, also testified. Mr. Quinn stated that he reviewed the dual induction sonic log on IPCO B-l and opined that several sands penetrated by IPCO B-l could be productive. Among the intervals he though would be productive were the Cotton Valley (Bodcaw), Taylor, Haynesville, and Smackover. Mr. Quinn testified that he recommended the Smackover be the initial target zone but that he thought that the Haynesville interval would also be productive. Mr. Quinn also explained that in normal drilling operations directed toward the Smackover lime formation, it is not normal procedure to “test up the hole.” Instead, the well is evaluated. Quinn also explained that to “evaluate” a well meant to run logs on the well. Conversely, to “test” a well meant to either run a drill stem test, during the drilling stage or perforating the formation, which entails setting pipe, and “frac’ing” the well to obtain the flow of hydrocarbons from a tight sand such as the Haynesville formation. Additionally, Mr. Bassett testified that drill stem tests on any tight sand such as the Haynesville would be inconclusive.
Several distinctions are immediately apparent between Matlock, Bass and the instant case. In Matlock, the well was simply drilled through the formation at issue to a deeper sand. The shallower sand at issue was never evaluated or tested. In Bass, the shallower sand was evaluated during the drilling process. Also, subsequent extensive tests were conducted during the period of the servitude in an effort to bring the well on line as a producer.
In the instant case, the shallower sand was not tested during the initial drilling operations to the deeper sand where production was obtained for some four months. Although the well was logged, these logs were not directed at any particular shallower formation. In order to obtain a true “test” of the Haynesville formation, a tight sand, would have entailed fracturing the sand to obtain the flow of hydrocarbons. This was not done in IPCO B-l. In fact, the true “testing” of the well did not begin until the Smackover interval was reached and a large gas kick was encountered.
The permit was obtained to drill to the Smackover interval and the well was subsequently completed as a commercial producer at that zone. Only after production could no longer be sustained at commercial levels from the Smackover lime was the well plugged back to the Haynesville interval and a permit to recomplete issued for that particular target zone. Moreover, the testimony at trial reflects that if the well had continued to produce in commercial quantities from the Smackover lime, another well would have been drilled to the Haynesville sand.
Consequently, the facts of this case fall somewhere between the facts of Matlock where no logs were apparently run on the shallower strata and where no testing of the formation occurred and the facts of Bass v. Kiene where there was logging activity as well as formation “testing” of the sand in question within the servitude period. Matlock thus holds that simply drilling through a shallower formation is not such a sufficient effort to obtain production at that formation as to interrupt prescription with respect thereto. In other words, Matlock was not an operation drilled to the point at issue to obtain production.
*150 Bass implicitly holds that testing of a shallower formation within the prescriptive period in a bona fide effort to obtain production is one continuous operation intended to obtain production from the shallower formation at issue such that prescription is interrupted with respect thereto. In other words, Bass, although started to a deeper formation, was a continuous good faith effort to produce from the shallower depth at issue under its circumstances.
The distinctions in the three cases considered, we have concluded that in the instant case the trial court correctly found that the drilling of the well to the Smack-over and the subsequent recompletion and production from the Haynesville formation were not one single operation so as to interrupt prescription under LSA-R.S. 31:29. We conclude, as did the trial court, that the completion of the well to the Smackover interval and the later recompletion of the well to the Haynesville formation was not a single operation as contemplated by LSA-R.S. 31:29. We therefore find it unnecessary to consider the effects of the evaluative logs run on the Haynes-ville during the attempt to bring the Smackover on line or to consider the subsequent testing of the Haynesville in the recompletion process within the context of the “commenced with reasonable expectations” terminology of LSA-R.S. 31:29(1). In other words, it is unnecessary to evaluate the issue of whether there was sufficient testing of the Haynesville to constitute a bona fide effort to obtain production from that interval because we agree that the instant circumstances do not present a single continuous operation. Thus, the running of prescription was not interrupted by the original spud date of the well, and plaintiffs mineral servitude was prescribed on October 2, 1982 by the ten year libera-tive prescription of non-use.
The judgment of the trial court is affirmed. Costs of this appeal are assessed against plaintiffs.
AFFIRMED.

. LSA-R.S. 31:28 provides that the prescription of non use of a mineral servitude commences from the date on which it is created. Thus, if no interruption occurred prescription would have accrued herein on October 2, 1980.

. LSA-R.S. 31:33 provides:
§ 33. Unit operations; effect as interruption of prescription
Operations conducted on land other than that burdened by a mineral servitude and constituting part of a conventional or compulsory unit that includes only a part of the land burdened by the servitude will, if otherwise sufficient to interrupt prescription according to Articles 29 through 32, interrupt prescription only as to that portion of the tract burdened by the servitude included in the unit provided such operations are for the discovery and production of minerals from the unitized sand or sands.