GASKINS, J.
 

 In this dispute concerning ownership of mineral rights, the plaintiffs, Martin Timber Company, LLC and Indigo Minerals, LLC, and plaintiffs in intervention, Cra-bapple Properties, Ltd., et al., appeal from the denial of the plaintiffs’ motion for summary judgment and the grant of summary judgment in favor of the defendants, Par-dee Minerals, LLC, et al., El Paso E & P Company, LP, Milagro Development I, LP, and Ceniarth, Ltd. For the following reasons, we affirm in part and reverse in part the trial court judgment and remand for further proceedings.
 

 FACTS
 

 The issue in this case is whether a servitude for mineral rights has prescribed for 10 years’ nonuse or whether the drilling of nonproducing wells has constituted a good faith use of the servitude. The plaintiffs, Martin Timber Company, LLC, and Indigo Minerals, LLC (Martin/Indigo), filed a suit for declaratory judgment on July 20, 2007, claiming that they own 100 percent of the mineral rights on land in Bienville Parish. Martin/Indigo also claimed entitlement to an accounting and payment of funds from the production of oil and gas on the land. Named as defendants were Pardee Minerals, LLC (Pardee), El Paso E & P Company, LP, Milagro Development, LP, and Ceniarth, Ltd. (El Paso).
 

 In a cash sale deed executed on December 7, 1971, Pardee Minerals conveyed to Willamette Industries, Inc., more than 8,000 acres of land in Bienville Parish which included land in Sections 26, 27, 84, and 35 in Township 15 North, Range 8 West. Pardee reserved a mineral servitude on 100 percent of the minerals in this tract. The land now involved in this | dispute (Disputed Tract) is a contiguous tract of approximately 1,100 acres, separate from other portions of the 8,000 acres conveyed to Willamette. On October 4, 1988, by act of exchange, Willamette conveyed to Martin Timber the ownership of a portion of this tract. On July 1, 2006, Martin Timber sold its mineral rights to ROM Minerals
 
 &
 
 Development Co., which later changed its name to Indigo. Therefore, Martin Timber, which owns the surface rights, and Indigo, which claims a 2006 mineral servitude, dispute the continued existence of the Pardee mineral servitude.
 

 The plaintiffs claim that the Pardee mineral servitude affecting the Disputed Tract terminated by 10-year prescription of non-use for failure to conduct appropriate mineral operations on or obtain production from the Disputed Tract. The plaintiffs acknowledge that since the creation of the Pardee servitude, three wells were drilled on the Disputed Tract, which is located in the King’s Dome field. The H.E. Sutton-Pardee Company No. 1 Well (Sutton Well) was drilled in 1980 with a proposed depth of 3,500 feet. The well was actually drilled to a depth of only 2,847 feet and then plugged and abandoned. The Kerr-McGee-Blackwood Land Company Well
 
 *1125
 
 No. 1 (Kerr-McGee Well) was drilled to the target depth of 8,000 feet. No production was obtained and operations were terminated on December 21,1989. On March 2, 1998, Pardee leased to Famcor Oil, Inc. (Famcor) a portion of the Disputed Tract. The lease was to terminate on December 31, 1998, unless Famcor drilled a well to 8,500 feet. A well (Famcor Well) was permitted to the depth of 9,500 feet. The well was drilled to 3,563 feet and salt was encountered. The well was abandoned on December 15,1998. All three wells drilled on the Disputed Tract were dry holes.
 

 The plaintiffs and plaintiffs in intervention challenge two of the wells drilled, claiming that they were insufficient to interrupt prescription in accordance with the provisions of Article 29 of the Louisiana Mineral Code found in La. R.S. 31:29 (Article 29). The Sutton Well and the Fam-cor Well, neither of which reached its permitted depth, both encountered difficulties in drilling which led to the abandonment of the wells as dry holes.
 

 According to the geological evidence presented by various experts, the King’s Dome underlying the Disputed Tract is a piercement salt dome, a large area of salt which has mushroomed up from the deep layers of the earth, disturbing the various formations and strata that are often the subject of oil and gas exploration. As the column of salt mushroomed upward to approximately 2,500-3,000 feet below the surface, the sequence of sedentary formations displaced “are severely distorted, pushed aside, faulted, eroded and ground up as the salt moves.” Above the salt dome, the formations discussed by the parties and identified by the geologists are the Austin Chalk, the Tuscaloosa, and the Paluxy. As the dome extended outward at its apex, the potentially productive formations were identified as lying below the overhang of the mushroom, or other “detailed bubbles of salt.” These deeper formations are the Hosston and Travis Peak. Before the drilling of the Famcor Well in 1998, the six prior wells drilled over the King’s Dome site had all been drilled in search of formations above the salt dome and were all dry holes. The earliest well was commenced in 1920. The Famcor Well was permitted for 9,500 feet as a test of the Hosston formation and sought the Hosston and Travis Peak prospects, identified from seismic data as lying under the horizontal salt mass or overhang and adjacent to the central column of salt.
 

 On January 23, 2001, Pardee gave a mineral lease to Carnes Oil Corporation covering portions of the Martin Timber tract. Carnes is now owned by the El Paso group.
 
 [1]
 
 El Paso drilled and completed a number of successful wells on the Martin Timber property or lands unitized with it. The plaintiffs claim that El Paso did not have the right to drill or produce minerals from the Martin Timber tract. The plaintiffs requested an order requiring El Paso to account for and remit any and all revenue gained from the production attributable to the Disputed Tract. The plaintiffs allege that El Paso is a possessor in bad faith and is not entitled to recoup expenses incurred in obtaining production and revenue.
 

 On April 21, 2008, Crabapple Properties and numerous other individuals (“Crabapple”) filed an intervention against the defendants joining in the claims of Martin/Indigo. The Crabapple plaintiffs in intervention claimed to be the
 
 *1126
 
 current owners of other portions of the Disputed Tract.
 

 On December 12, 2008, El Paso filed a motion for summary judgment against the plaintiffs and plaintiffs in intervention claiming that the Pardee mineral servitude was maintained in full force and effect through a series of good faith drilling operations and that the Pardee lease to El Paso in 2001 is valid. El Paso claimed that the prescription of nonuse was interrupted by the drilling of the Sutton Well, the Kerr-McGee Well, and the Famcor Well. Based upon the Pardee lease, El Paso claimed that it spent tens of millions of dollars successfully drilling a series of wells on the property.
 

 On April 17, 2009, Martin/Indigo filed a motion for summary judgment. They contended that the defendants could not carry their burden of proving that either the Sutton or the Famcor Well was sufficient to interrupt prescription. Based upon jurisprudence from this court applying Article 29, they argued that the operator of a well must evaluate and test the objective formations in order to interrupt the running of prescription. Challenging both the Sutton and Famcor Wells as dry hole operations which, under Article 29, did not interrupt prescription, they contended that the Pardee mineral servitude prescribed no later than December 22, 1999, ten years after the Kerr-McGee Well was plugged and abandoned.
 

 A hearing on the motions for summary judgment was held in the trial court on June 4, 2009. The trial court found that, in accordance with Article 29, the operations conducted in the drilling of the Sutton Well, the Kerr-McGee Well, and the Famcor Well were good faith operations for the discovery and production of minerals, and each well interrupted the running of the 10-year prescription of nonuse pertaining to the mineral servitude created on December 7, 1971, affecting the Disputed Tract. This finding appears to be based upon the geological implications of production of wells in other fields in the general area at the depth of the disputed wells. The trial court also considered the amount of money spent in drilling the Famcor Well. The motion for summary judgment in favor of the defendants was granted. The motion for summary judgment by Martin/Indigo was denied. The claims of Martin/Indigo and Crabapple were dismissed with prejudice; they appealed.
 

 ARGUMENTS OF MARTIN/INDIGO AND CRABAPPLE
 

 Martin/Indigo and Crabapple have adopted each other’s appellate arguments. They essentially assert that neither the Sutton Well nor the Famcor Well was sufficient to interrupt the running of 10 years’ prescription of nonuse under the good faith requirements set forth in Article 29. They claim that if either well failed to meet the requirements, then the prescription of nonuse has not been interrupted on the Pardee servitude and the defendants have no existing claim to the minerals under the Disputed Tract.
 

 They contend that the defendants, as the purported owners of the servitude, have the burden of proving that they made timely use of the servitude in order to prevent the accrual of prescription. They urge that any doubt about the Pardee servitude should be resolved in favor of Martin/Indigo and Crabapple.
 

 Martin/Indigo and Crabapple argue that, under Article 29, in order to interrupt prescription, the operator must expect, at the time the drilling commenced, to obtain commercial production from a specific subsurface location and that expectation must be reasonable. They maintain that in this case, the only evidence of good faith that
 
 *1127
 
 the defendants presented was that other producing wells in the area were drilled to the level of the Famcor Well and that Famcor spent $500,000 to drill its well. Martin/Indigo and Crabapple argue that the trial court read out the portion of the article that required operations to be commenced with a reasonable expectation of discovering and producing minerals in paying quantities.
 

 Martin/Indigo and Crabapple maintain that Famcor had evidence and knowledge in its possession at the time of the drilling of its well which demonstrated that production in the more shallow formations was not expected. They point out that the salt dome geological feature is not present in the other fields containing the wells used for comparison. They cite jurisprudence finding that the mere act of drilling through a shallower sand without the manifestation of an intent to obtain production at that depth was not sufficient to interrupt the running of the prescription of nonuse. •
 

 Martin/Indigo and Crabapple claim that there is a genuine issue of material fact with respect to whether there was an objective, reasonable expectation of reaching production at the depth to which the Sutton Well and Famcor Wells were drilled.
 

 LEGAL PRINCIPLES
 

 The appellate court’s review of a grant or denial of summary judgment is
 
 de novo. Independent Fire Insurance Company v. Sunbeam Corporation,
 
 1999-2181, 1999-2257 (La.2/29/00), 755 So.2d 226;
 
 Schroeder v. Board of Supervisors of Louisiana State University,
 
 591 So.2d 342 (La.1991). A motion for summary judgment is a procedural device used when there is no genuine issue of material fact.
 
 King v. Illinois National Insurance Company,
 
 2008-1491 (La.4/3/09), 9 So.3d 780. The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action allowed by law. La. C.C.P. art. 966(A)(2). A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B);
 
 Cutsinger v. Redfern,
 
 2008-2607 (La.5/22/09), 12 So.3d 945.
 

 The burden of proof remains with the movant. La. C.C.P. art. 966(C)(2). However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
 
 Wall v. Kelly Oil & Gas Company, Inc.,
 
 44,604 (La.App.2d Cir.12/21/09), 27 So.3d 1071,
 
 writ denied,
 
 2010-0122 (La.4/5/2010), 31 So.3d 372.
 

 A fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of a legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for a trial on that issue and summary judgment is appropriate.
 
 Wall v. Kelly Oil & Gas Company, Inc., supra.
 

 Louisiana law governing mineral servitudes does not recognize a separate
 
 *1128
 
 mineral estate in oil and gas. Mineral rights can be owned separate from the surface land in the form of a mineral servitude. Any attempt to sell or reserve the ownership of oil and gas results in the creation of a mineral servitude, and the holder of that servitude has the right to enter the property and extract the minerals. Louisiana law has long provided that a mineral servitude is extinguished by prescription resulting from 10 years’ nonuse. The period of prescription on mineral ser-vitudes begins to run on the date a servitude is created, and is interrupted only by good faith operations for the discovery and production of minerals.
 
 Petro-Hunt, L.L.C. v. United States,
 
 365 F.3d 385 (5th Cir.2004). See also
 
 Reeves v. Reeves,
 
 607 So.2d 626 (La.App. 2d Cir.1992),
 
 writ denied,
 
 608 So.2d 1010 (La.1992).
 
 [2]
 

 Regarding the requirements for good faith operation and interrupting the running of prescription on a mineral servitude, Article 29 provides:
 

 The prescription of nonuse running against a mineral servitude is interrupted by good faith operations for the discovery and production of minerals. By good faith is meant that the operations must be
 

 (1) commenced with reasonable expectation of discovering and producing minerals in paying quantities at a particular point or depth,
 

 (2) continued at the site chosen to that point or depth, and
 

 (3) conducted in such a manner that they constitute a single operation although actual drilling or mining is not conducted at all times.
 

 In ruling on a motion for summary judgment, the judge’s role is not to evaluate the weight of the evidence or to determine the truth of the matter, but is to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the nonmoving party’s favor.
 
 Wall v. Kelly Oil & Gas Company, Inc., supra.
 
 A motion for summary judgment is usually not appropriate for disposition of cases requiring judicial determination of subjective facts, such as motive, intent, good faith, or knowledge. La. C.C.P. art. 966;
 
 Ray v. City of Bossier City,
 
 37,708 (La.App.2d Cir.10/24/03), 859 So.2d 264,
 
 writs denied,
 
 2003-3254, 2003-3214 (La.2/13/04), 867 So.2d 697;
 
 Harrison v. Parker,
 
 31,844 (La.App.2d Cir.5/5/99), 737 So.2d 160,
 
 writ denied,
 
 1999-1597 (La.9/17/99), 747 So.2d 565;
 
 Miramon v. Woods,
 
 25,850 (La.App.2d Cir.6/22/94), 639 So.2d 353.
 

 DISCUSSION
 

 The plaintiffs and the plaintiffs in intervention contend that, because the Sutton and Famcor Wells were not drilled to the target depth and were not tested for production during the course of drilling, the requirements of Article 29 have not been satisfied. The plaintiffs and plaintiffs in intervention assert that the determination of whether the prior wells were good faith operations sufficient to interrupt prescription requires both a subjective and objective inquiry. This argument appears to be based upon the comments to Article 29 which provide in pertinent part:
 

 Insofar as the petroleum industry is concerned, Article 29 perpetuates the rule that dry hole drilling operations
 
 satisfyi
 
 ng
 
 the stated criteria
 
 will interrupt prescription. See
 
 Taylor v. Dunn,
 
 233 La. 617, 97 So.2d 415 (1957);
 
 White v.
 
 
 *1129
 

 Frank B. Treat & Son, Inc.,
 
 230 La. 1017, 89 So.2d 883 (1956);
 
 McMurrey v. Gray,
 
 216 La. 904, 45 So.2d 73 (1950);
 
 International Paper Co. v. Louisiana Central Lumber Co.,
 
 202 La. 621, 12 So.2d 659 (1943);
 
 Hunter Co. v. Ulrich,
 
 200 La. 536, 8 So.2d 531 (1942);
 
 Ohio Oil Co. v. Cox,
 
 196 La. 193, 198 So. 902 (1940);
 
 Lynn v. Harrington,
 
 193 La. 877, 192 So. 517 (1939);
 
 Louisiana Petroleum Co. v. Broussard,
 
 172 La. 613, 135 So. 1 (1931);
 
 Keebler v. Seubert,
 
 167 La. 901, 120 So. 591 (1929);
 
 Kellogg Bros. Inc. v. Singer Mfg. Co.,
 
 131 So.2d 578 (La.App. 2d Cir.1961).
 
 What will constitute drilling to a point at which there is reasonable expectation of commercial production varies from case to case depending cm the circumstances.
 
 Reasonableness of expectation in a wildcat area may not be similar in any respect to reasonableness in a known productive area. The courts have reflected a commendably sound attitude in these situations, applying an objective standard to determine the reasonableness of the expectation. [Emphasis supplied.] Some comment is appropriate on the rather curious mixture of subjective and objective standards in [this Article.] Operations must be in “good faith,” but “good faith” is proven only if the operations meet evidentiary standards requiring that there be a “reasonable” expectation of production, an objective standard. This is, however, the test evolved by the courts and it has proven workable. Short of the standards stated in [this Article], then, no amount of subjective good faith or effort will sustain a contention that a use has occurred. See
 
 Louisiana Petroleum Co. v. Broussard, supra.
 
 The standard which has developed is a statement of a basic requirement — i.e. good faith operations for the discovery and production of minerals — accompanied by the statement of an evidentiary standard — i.e. drilling to a depth at which there is a reasonable expectation of commercial production. The evidentiary requirement is a well-conceived judicial device for assuring a reasonably certain and administrable standard of proof that “good faith operations” have been conducted and a use has resulted. Any lesser standard would inject the court into an impenetrable forest of cases involving the good faith of operators who have fallen short of the evidentiary standard now applied and would introduce an undesirable degree of subjectivity and, thus, uncertainty into the law of use. What the courts have done, then, is to shape a subjective standard — “good faith” — into an objective one by addition of the requirement of reasonableness of the expectation of production.
 

 The defendants urge that the standard for determining good faith is entirely objective. They claim that they intended to explore both shallow and deep levels for production of oil and gas and therefore, the drilling of the Famcor Well to 3,563 feet passed through formations above the salt dome in which they reasonably expected to discover and produce minerals in paying quantities.
 

 To determine good faith, Article 29’s first inquiry is whether the operation was commenced with a reasonable expectation of discovering
 
 and
 
 producing minerals in paying quantities at a particular point or depth. After determining whether operations were commenced with a reasonable expectation of discovering and producing minerals in paying quantities at a particular point or depth, the second inquiry under Article 29 is whether the operation was continued at the site chosen to that point or depth. The third element of Article 29 requires that operations be conduct
 
 *1130
 
 ed in such a manner that they constitute a single operation although actual drilling or mining is not conducted at all times. This third element is not at issue in this case.
 

 An example of the first prong of Article 29, whether an operation was commenced with a reasonable expectation of discovering and producing minerals in paying quantities, is shown in
 
 McMurrey v. Gray, supra.
 
 In that case, a well was commenced with a permit to the shallow Naca-tosh sand and was drilled to that point with no production. The operator removed a small drilling rig and temporarily plugged the well before obtaining a permit to deepen the well to the Travis Peak zone at approximately 6,000 feet. The operator was prevented by the surface owner from reentering the land with a larger drilling rig for further operations. The Louisiana Supreme Court first considered whether the well drilled to the Naca-tosh sand was sufficient to interrupt prescription on the mineral servitude. The supreme court found that the drilling of the well must be in good faith with a reasonable expectation that the well will be a producer. The supreme court determined that the evidence submitted at the trial on the merits in that case failed to show that there was a reasonable possibility of obtaining production from the Naca-tosh sand, as this sand had long been depleted. The court was not persuaded by the geologist’s testimony, pointing out that the geologist knew nothing about the development of the area for oil and gas, was not familiar with the history of Nacatosh production in the area, and merely superimposed the subsurface structure on a surface map which he prepared from the logs of wells drilled in the area. Therefore, the operator could not have reasonably expected to discover minerals, much less produce them in paying quantities from the Naca-tosh sand. The drilling of a well to that sand did not interrupt prescription.
 
 [3]
 

 The element of a reasonable expectation of production in paying quantities, required by Article 29, is illustrated in
 
 Matlock Oil Corporation v. Gerard,
 
 263 So.2d 413 (La.App. 2d Cir.1972),
 
 writ not considered,
 
 262 La. 969, 265 So.2d 241 (La.1972). The court was not focused on whether there was a reasonable expectation of
 
 discovering
 
 minerals, but on whether there was a reasonable expectation of
 
 producing
 
 minerals in paying quantities at a certain unitized depth.
 
 [4]
 
 In
 
 Matlock,
 
 a dispute arose between parties claiming to hold mineral servitudes and the surface owners of the land. The Lower Hosston formation was unitized for the property in question, yet was undrilled. A well was started off the servitude property, but in the unit for the Lower Hosston. The Lower Hos-ston formation was encountered, tested, and found not to be productive. The well continued and was completed as a producer in the lower Sexton formation. The servitude owners contended that drilling through the Lower Hosston formation in the unit interrupted the running of prescription and preserved the servitudes located within that unit.
 

 This court opined that resolution of the issue depended upon whether the servitude owners made a
 
 bona fide
 
 attempt to obtain production from the unitized Lower
 
 *1131
 
 Hosston formation and thus exercised their servitudes as to other tracts within the unit before prescription had run. The well in question had a permitió drill to the Smackover formation at 10,600 feet. The evidence showed that during the drilling, testing of the well did not begin until the Lower Hosston formation had almost been completely drilled. The court concluded that the facts of the case failed to show that there was any intent to obtain production at the Lower Hosston formation. This court was particularly impressed with the fact that no
 
 bona fide
 
 attempt was made to test this formation during the drilling. Accordingly, this court determined that the mineral servitude had prescribed.
 

 An early case establishing the standard of good faith in the interruption of prescription focused on whether an operation was continued at the site chosen to the particular point or depth at which there was a reasonable expectation of discovering and producing minerals in paying quantities. In
 
 Louisiana Petroleum Company v. Broussard, supra,
 
 the supreme court considered whether the plaintiffs’ mineral rights had been lost by the prescription of 10 years. The supreme court stated that no ironclad rule can be established to determine whether there has been such a use as to interrupt prescription. The supreme court found that, in a mineral servitude setting, where the exploiting, though begun, has been stopped or abandoned at a depth at which there was no reasonable hope of discovering minerals in paying quantities, such operations, which in one sense amount to a dry hole, are insufficient to constitute use of the servitude. In
 
 Broussard,
 
 the supreme court ruled that the well drilled and abandoned at a depth where it was known that production in paying quantities could not be expected, did not interrupt prescription.
 

 Before and after the enactment of Article 29, the courts have studied numerous factors in evaluating the presence or absence of good faith sufficient to interrupt prescription on a servitude. Some of these factors include the geology of the drilling site and surrounding area based upon pri- or wells and seismic data; the expertise and experience of the geologists, petroleum engineers, and oil men making the recommendations and decisions; the depth of review of the available geology; the timing of the lease and its terms; the expenses incurred in the operation; the permit | ^applications; the various types of testing performed; the analysis of formations encountered during drilling; the keeping of well logs; the time put into drilling; the depth drilled; and the size of pipes used. This nonexclusive list, along with the credibility assessment of testimony given at trial, is to be weighed by the trial court in making the good faith determination which is now embodied in Article 29. See
 
 Keebler v. Seubert, supra; Lynn v. Harrington, supra; Hunter v. Ulrich, supra; McMurrey v. Gray, supra; Taylor v. Dunn, supra; Kellogg Brothers, Inc. v. Singer Manufacturing Company, supra; Bass Enterprises Production Company v. Kiene,
 
 437 So.2d 940 (La.App. 2d Cir.1983).
 

 The question of whether operations in connection with a particular well constitute a use of the servitude in such a manner as to interrupt the running of prescription, is a question of fact dependent upon the particular circumstances under which the operations were conducted and the factor of good or bad faith on the part of the operators is inextricably connected with, although not wholly decisive of, the factual situation presented.
 
 Kellogg Brothers v. Singer Manufacturing Company, supra; Bass Enterprises Production Company v. Kiene, supra.
 
 Fact ques
 
 *1132
 
 tions, particularly dealing with the good faith test under Article 29, are not appropriate for decision on motions for summary judgment.
 

 As to both the Sutton Well and the Famcor Well, there are genuine issues of material fact as to the reasonable expectation, at the time the wells were commenced, of discovering and producing minerals in paying quantities at the levels to which the wells were drilled. In particular, the geological experts for Martin/Indigo and Crabapple assert that there was no reasonable expectation of discovering and producing minerals in the formations above the salt dome at the time of the drilling of the Famcor Well. There is a contrary view contained in deposition testimony from Famcor personnel regarding the geology of the area and their expectations at the commencement of the well. These affidavits, depositions, and other documents require a weighing of credibility and evidence to make a decision regarding the presence or absence of good faith measured under Article 29(1) for the shallow depths above the salt dome.
 

 The record contains very little information regarding the Sutton Well other than the records from the Louisiana Office of Conservation. The well was permitted for a depth of 3,500 feet to test the Paluxy formation. The well encountered mechanical difficulties at 2,847 feet when the operators “twisted off” in the hole and began a “fishing” operation to remove the obstruction. The well apparently never encountered the Paluxy formation.
 

 There is also an issue of material fact created by the abandonment of drilling as to whether any point or depth had been reached at which the operators of both wells reasonably expected, at the commencement of operations, to discover and produce minerals in paying quantities. If the permitted depths for both the Sutton and Famcor Wells prove to be the
 
 only
 
 formations in those wells which meet the criteria of Article 29(1) as potential depths of discovery, the problems of both wells which caused them to be abandoned prior to reaching those depths call into question whether the requirement of Article 29(2) was meet.
 

 In ruling on a motion for summary judgment, the judge’s role is not to evaluate the weight of the evidence or determine the truth of the matter, but is to determine whether there is a genuine issue of triable fact. The defendants have not carried their burden of proving that summary judgment is appropriate in this matter.
 

 The trial court correctly denied the plaintiffs’ motion for summary judgment, but erred in granting summary judgment in favor of the defendants. That decision is reversed and the matter is remanded to the trial court for further proceedings.
 

 CONCLUSION
 

 For the reasons stated above, we affirm that portion of the trial court ruling denying the motion for summary judgment filed by the plaintiffs, Indigo Minerals and Martin Timber Company. We reverse that portion of the trial court ruling granting summary judgment in favor of the defendants, Pardee Minerals, LLC, et al., El Paso E & P Company, LP, Milagro Development I, LP, and Ceniarth, Ltd., dismissing the claims of the plaintiffs, Indigo Minerals and Martin Timber Company, and the plaintiffs in intervention, Crabap-ple Properties, Ltd., et al. We remand to the trial court for further proceedings. Costs in this court are assessed to the defendants.
 

 AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS.
 

 
 *1133
 
 APPLICATION FOR REHEARING
 

 Before BROWN, STEWART, GASKINS, CARAWAY and LOLLEY, JJ.
 

 Rehearing denied.
 

 [1]
 

 . At some point, Richard P. de Camara, James Thigpen, Michael M. Carnes, Suzanne Carnes, Carnes Texas Ltd., and Carnes Oil Company were added as defendants with Par-dee Minerals, LLC.
 

 [2]
 

 . An interruption of prescription takes place on the date actual drilling or mining operations are commenced on the land burdened with the servitude or, as provided in La. R.S. 31:33, on a conventional or compulsory unit including all or a portion thereof. La. R.S. 31:30.
 

 [3]
 

 . However, in
 
 McMurrey,
 
 the supreme court concluded that the operator did not abandon the well and intended to drill deeper. The court ruled that the operator should be allowed to continue drilling to a deeper level.
 

 [4]
 

 . When a formation is unitized, the burden of showing a “reasonable expectation of discovering" minerals is less than that in a nonuni-tized formation because the commissioner of conservation has considered the available geological and engineering evidence prior to creating the unit. See La. R.S. 30:9.