Judgment rendered March 4, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,252-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

CANNISNIA PLANTATION, LLC            Appellant

versus

CECIL BLOUNT FARMS, LLC              Appellees
AND BLOUNT COMPANY, LLC

* * * * *

Appealed from the
Thirty-Ninth Judicial District Court for the
Parish of Red River, Louisiana
Trial Court No. 36,331

Honorable Lewis O. Sams, Judge

* * * * *

SINCLAIR LAW FIRM, INC.               Counsel for Appellant
By: Scott C. Sinclair

DOWNER, JONES, MARINO                 Counsel for Appellees
& WILHITE, L.L.C.
By: Philip Edward Downer, III
    Michael Alan Marino

* * * * *

Before COX, STEPHENS, and THOMPSON, JJ.

THOMPSON, J., dissents with written reasons.

**COX, J.**

This suit originated in Red River Parish to determine whether a well was drilled in good faith in order to interrupt the running of prescription on a mineral servitude. The subject property is as follows:

> The South Half (S/2) of the Southwest Quarter (SW/4) and the Northwest Quarter (NW/4) of the Southwest Quarter (SW/4) of Section 2; the North Half (N/2) of the North Half (N/2), the South Half (S/2) of the Northeast Quarter (NE/4), and the East 34 acres out of the Southeast Quarter (SE/4) of the of the [sic] Northwest Quarter (NW/4) of Section 11; Those portions of Lots 5, 6, and 7, in Section 12 lying South of Boggy Bayou LESS AND EXCEPT that part of Lot 7, consisting of 12 acres more or less, sold to Betty Blount Kyson, et ux. in a deed dated September 22, 1982 and of record in Conveyance Book 200, page 1016 of the Records of Red River Parish, Louisiana, all in Township 14 North, Range 12 West, Red River Parish, Louisiana.[1]

> The Southeast Quarter and the Northeast Quarter of the Southwest Quarter of Section 2, Township 14 North, Range 12 West, Red River Parish, La.[2]

The plaintiff/appellant is Cannisnia Plantation, LLC ("Cannisnia"). The defendants are Cecile Blount Farms, LLC ("Blount Farms") and Blount Company, LLC ("Blount Company"), jointly referred to as "the Blounts."

*Property History*

Thomas Blount sold the Blount Servitude property to Cannisnia in a credit sale deed dated June 28, 1996. Mr. Blount reserved "one-half of the oil, gas and other liquid and gaseous hydrocarbon minerals, together with all rights of ingress and egress necessary and convenient to explore for, produce, save and transport said minerals." The 10-year prescription clock for this mineral servitude began running on June 28, 1996. Cannisnia and

---

[1] Referred to as the "Blount Servitude."

[2] Referred to as the "Exchange Servitude." The minerals in the Exchange Servitude are not in dispute. This mineral servitude prescribed in June of 2006.

1

Mr. Blount executed an act of exchange on June 28, 1996, in which Mr. Blount conveyed to Cannisnia the Exchange Servitude. In the exchange, Mr. Blount reserved "one-half of the Oil, Gas and other liquid and gaseous hydrocarbon minerals[.]"

Mr. Blount and Cannisnia also entered into a binding arbitration agreement on June 28, 1996. The agreement states that Mr. Blount "has expressed concerns that he may be effectively precluded from the enjoyment of his mineral reservation in the event Cannisnia becomes unwilling to execute an oil, gas and other mineral lease (a 'Lease') covering its one-half interest in the Minerals." The two parties signed a right of first refusal on property in the North Half of Section 2, Township 14 North, Range 12 West in Red River Parish and additional property in Caddo Parish.

Mr. Blount conveyed his mineral servitude from the Blount Servitude to Blount Farms on December 6, 2001. On January 26, 2006, Blount Farms conveyed the servitude to Blount Company in a "Conveyance and Assignment of Mineral Servitude with Obligation to Drill and Reservation of Royalty." As consideration for the assignment, Blount Company agreed to drill a well prior to June 15, 2006, above a depth of 2,900 feet. After the well was drilled, Mr. Blount, individually and on behalf of the Blounts, filed an acknowledgment of interruption of mineral servitude over the Blount Servitude. The acknowledgment was filed in the conveyance records on June 15, 2006. Blount Company conveyed the mineral servitude back to Blount Farms on September 30, 2010.

On October 1, 2008, in three separate mineral deeds, Cannisnia conveyed to Petrohawk Properties, LP, an undivided 72.5% of all of its

right, title, and interest in and to all oil, gas, and related hydrocarbons in, on, and under Sections 2, 11, and 12, Township 14 North, Range 12 West. All of the mineral deeds were limited to "those depths located below the stratigraphic equivalent of the base of the Cotton Valley formation[.]" Petrohawk offered Cannisnia $30,000 an acre. Petrohawk did not pay Cannisnia for the disputed interest caused by whether or not the Blount well interrupted prescription.

The Blounts executed the following leases:[3]

OGML
Executed 8/14/2001          Recorded 8/24/2001
Blount Farms (Lessor)       Caruthers Producing (Lessee)
Section 2, Township 14 North, Range 12 West

OGML
Executed 11/14/2001        Recorded 3/15/2002
Blount Farms (Lessor)       Huggs, Inc. (Lessee)
Sections 2, 11, & 12, Township 14 North, Range 12 West

OGML
Executed 11/14/2001        Recorded 3/15/2002
Blount Farms (Lessor)       Huggs, Inc. (Lessee)
Section 12, Township 14 North, Range 12 Weset

OGML
Executed 11/14/2003        Recorded 12/17/2003
Blount Farms (Lessor)       Stroud Production (Lessee)
Section 12, Township 14 North, Range 12 West

OGML
Executed 7/30/2005          Recorded 8/15/2005
Blount Farms (Lessor)       Rippy Energy, Inc. (Lessee)
Section 12, Township 14 North, Range 12 West

OGML
Executed 7/30/2005          Recorded 8/15/2005
Blount Farms (Lessor)       Rippy Energy, Inc. (Lessee)
Section 12, Township 14 North, Range 12 West

---

[3] Only lands from the minerals in dispute are listed, although the leases may contain other properties.

3

OGML
Executed 6/14/2006              Recorded 6/26/2006
The Blounts (Lessors)        Matador Resources (Lessee)
Section 2, Township 14 North, Range 12 West

OGML
Executed 4/10/2008              Recorded 4/25/2008
Blount Company (Lessor)     Meagher Oil & Gas (Lessee)
Covering Section 11, Township 14 North, Range 12 West

OGML
Executed 4/10/2008              Recorded 4/25/2008
Blount Farms (Lessor)       Meagher Oil & Gas (Lessee)
Covering Section 12, Township 14 North, Range 12 West

Cannisnia executed the following lease:

Oil, Gas, and Mineral Lease ("OGML")
Executed 12/15/2005           Recorded 12/27/2005
Cannisnia (Lessors)          Rippy Energy, Inc. (Lessees)
Section 12, Township 14 North, Range 12 West

*Production History*

Before the Blounts drilled the well, which is at the center of this dispute, there had not been any mineral production on the property. On January 27, 2006, the Blounts submitted an application to drill a well to the Louisiana Office of Conservation. On February 23, 2006, the application was approved and a permit issued for the drilling of the well. The proposed depth of the well was designed to encounter the Blossom, Paluxy, and Tuscaloosa zones. On March 28, 2006, Blount Company spudded the Cannisnia-Blount No. 1 well in Section 12 of the property. The well was plugged and abandoned by Blount Company on April 21, 2006.

In 2007, Rippy Energy drilled a Cotton Valley unit well in Section 12 called the Rippy Oil Company/Blount No. 1 well. Questar Exploration and Production later acquired this Rippy well. In 2011, Chesapeake Exploration,

4

LLC, drilled a well Section 11. Chesapeake also drilled a well in Section 12 in 2011.

*Procedural History*

On November 5, 2014, Cannisnia sent notice to Blount Farms that the mineral servitude had expired and requested that Blount Farms furnish a recordable act evidencing the expiration of the servitude, effective June 28, 2006. Blount Farms did not execute the requested act. On December 22, 2014, Cannisnia filed the instant suit against the Blounts, claiming the mineral servitude prescribed because the well drilled by Blount Company was not drilled in good faith, in order to interrupt the running of prescription. Cannisnia prayed for the following relief in its petition:

1. A declaratory judgment holding that the mineral servitude over the property was extinguished on June 28, 2006 by the running of the prescription of non-use;

2. Damages from Blount Company's drilling of the well, along with legal interest;

3. Damages for Blount Farms' failure to provide a recordable instrument acknowledging the extinction of the servitude, along with legal interest;

4. Attorney fees and all costs of court, along with legal interest; and

5. For all other relief to which Cannisnia may be shown to be entitled.

On January 8, 2015, the Blounts filed their answer and dilatory exceptions of vagueness and ambiguity and peremptory exception of no cause of action. On February 23, 2015, Cannisnia filed its first amended petition, amending the prayed relief to be:

1. A declaratory judgment holding that the mineral servitude over the property was extinguished on June 28, 2006 by the running of the prescription of non-use;

2. Such damages as may be established at the trial of this action from lost leasing opportunies, along with legal interest thereon from the date of demand;

4. Attorney fees and all costs of court, along with legal interest; and

5. All other relief to which Cannisnia may be shown to be entitled.

On August 25, 2015, the Blounts filed a peremptory exception of non-joinder. They argued that because they executed mineral leases covering the property after the well was plugged, those companies currently holding the leases should have been added. They argued that if the ruling in the suit goes in Cannisnia's favor, it would deprive those companies of their respective interest in the leases. The Blounts withdrew their peremptory exception of nonjoinder, and the trial court signed the withdrawal of the exception on November 23, 2015.

At trial, Edward "Chip" Campbell, III, was the first to testify. Chip, his brother, Chris Campbell, and his father own Cannisnia. Chip's background includes investing in oil, gas, and other minerals. He testified that Cannisnia was formed to buy recreational property. He stated that they would try to buy at least one-half of the minerals when they purchased property in order to help control some of the surface activity when oil or gas wells were drilled. He testified that they were not always successful in acquiring the minerals of the tracts they purchased.

Chip testified that because of his background and investing in oil and gas activities, he had a general idea of oil and gas activity in the area of the

subject property. He stated that he was aware of some oil and gas play in the "Cotton Valley, Hosston-type prospect, deep well interests" around 2002 to 2005. He testified that he received a letter from the Blounts' attorney with an AFE (authorization for expenditure), which was lacking pertinent information like the total cost and location of the well. He stated that he received AFEs in past investing activities and knew what information to expect. Chip testified that Cannisnia could not have participated in the well because their mineral interest was held by a lease to Rippy Energy. Chip stated that the well drilled by the Blounts was a dry hole.

Chip testified that they waited until 2014 to send the letter to the Blounts about the mineral release because they were tied up with resolving a similar issue on another tract of land. He stated that the Haynesville Shale "started ramping up" around November of 2014. Chip testified that they determined that they were not going to be able to amicably resolve the mineral servitude issue with the Blounts and decided to make a formal request for the release of the mineral servitude.

On cross-examination, Chip acknowledged documents from 2008, which did not credit Cannisnia with 100 percent of the mineral interest in the subject area. He also acknowledged reports prepared for him by David Morgan in 2014, which did not credit Cannisnia with 100% of the mineral interest in the subject area.

Thomas Blount, Jr., testified that he is a member of both Cecil Blount Farms and Blount Company. He confirmed the leases signed by the Blounts to various entities covering the subject servitude. He testified that he was aware that the Blount servitude would prescribe in 10 years for nonuse.

Thomas stated that his former brother-in-law, Don Webb, is a geologist and evaluated the Blount acreage for mineral prospects. He testified that prior to the Blount well being drilled, Mr. Webb had only generated one other drilling prospect on the Blount acreage.

Thomas testified that in 2005, the Cotton Valley drilling activity was getting active. He stated that the Cotton Valley formation was down to about 10,000 feet. He stated that he knew of various operators drilling successful Cotton Valley wells all around the Blount servitude in 2005. He testified that the initial production rates were 3 to 4 million cubic feet per day and gas prices were $6 to $7 per mcf, which comes to at least $18,000 per day. He stated that those numbers provided incentive to keep the mineral servitude "alive." Thomas testified that the Blounts were in correspondence with Stroud Exploration Company to lease any available minerals from the servitude. He testified, "[W]e made it quite clear that -- that, you know, we -- we would like a well drilled before this time ran out. And that was how everything was portrayed." He testified that part of the correspondence with Stroud involved a proposal that would request Cannisnia to voluntarily agree to extend the mineral servitude. Thomas stated that they did not ultimately sign a lease with Stroud. He stated that after that, the Blounts began discussions with Matador to lease their mineral servitude, but would need to prevent their mineral servitude from prescribing before they could sign the lease.

During Thomas's testimony, an email from Mr. Webb was introduced, which states the following, in pertinent part:

> At Cecil Blounts Request I'm sending you the following
> information regarding his royalty servitude in Sections 2, 11,

and 12 of T14N-R12W, where Mr. Blount owns 1/2 the
minerals (Campbell owns the other 1/2).

For a dry hole to perpetuate the minerals for another 10 years, a
well must be drilled to a known producing zone in the area.
The Nacatoch Sand fits this requirement.  The Nacatoch Sand
occurs in this area at a depth of 900'-950', and has produced
4,000' due north of the acreage in Section 2, 4,800' due south
of the acreage in Section 11, and 3,900' due east of the acreage
in Section 12.

A well on any of the above described land, drilled to the
Nacatoch Sand should perpetuate Mr. Blounts 1/2 mineral
interest for another 10 years, in as all the land is contiguous,
and in the same bill of sale which reserved the mineral interest.

In response to the introduction of the email, Thomas testified, "But we had no intention of just drilling a Nacatoch well or a hole out there.  We went to make gas and that's why we went to the Tuscaloosa.  Because we had seen that Caruthers[4] well and what it produced we wanted to replicate that."  Thomas stated that his father ran the Blount companies, but they did vote on decisions, like drilling the well.  He testified that neither he nor his father had any experience in permitting wells or investing in well production.  He stated that his father was a registered operator with the Office of Conservation because he took over a well from another operator on their property.  He stated that his father never sold production from this well to any third parties, and the production was used for running the family homes and irrigation equipment.

Thomas testified that they hired Ross White, a geologist, before drilling the well.  He stated that Mr. White completed his work on February 9, 2006.  He testified that his dad's plan was to drill through the Nacatoch,

---

[4] Caruthers Producing drilled a successful well to the Tuscaloosa formation in 2002, about a mile and a half north of the Blount well.

into the Tuscaloosa formation. Mr. White's report stated that the prospective area to drill and surrounding area "has several fields producing or were productive from the Blossom, Tuscaloosa and Paluxy sands." He further estimated that total revenue for gas would be $6.16 million and oil would be $1.046 million. Thomas testified that he personally picked the drill site. He stated that he chose a site that was viable to drill on, not flooded, and accessible.

Steven Cowgill, a certified petroleum geologist, was accepted by the court as an expert in the areas of oil and gas geology, prospect generation, prospect assembly, and oil and gas exploration. Mr. Cowgill stated that after listening to the testimony of Thomas, his opinion is that the Blounts did not have the knowledge and experience necessary to make an informed decision about drilling a well. He also stated that it is his opinion that Mr. White did not spend an adequate amount of time generating the well prospect, as Mr. White's invoice stated he spent 22 hours working on the prospect. Mr. Cowgill's opinion is that this is not an adequate amount of time for a making a commercial well. Mr. Cowgill pointed out deficiencies in the prospect map generated by Mr. White. He testified that the Blounts did not follow the correct sequence in drilling the well. He stated that they should have had the geological work done before permitting the well and deciding to drill.

On cross-examination, Mr. Cowgill stated that he had never been involved in a mineral development of a mineral servitude that was reserved by an owner in the sale of land. He stated that it is common in the oil and gas industry for geologists to have differing interpretations and opinions. Mr. Cowgill stated that the Blounts had access to legal counsel, an engineer,

and a geologist before the drilling. He also agreed that the Blounts hired a drilling company, and all of these individuals and companies brought their experience with them to the drilling project.

Billy Bridges, a drilling contractor with BLB Service, testified on behalf of the Blounts. He testified that he drilled the Blount well for the Blounts. He stated that he had about 40 years of experience in the drilling business and had drilled hundreds of wells before bidding to drill the Blount well. He testified that they spudded the well on March 30, 2006, reached the total depth on April 20, 2016, and plugged it on April 24, 2016. He stated that he has drilled wells in the past for people wanting to interrupt prescription. He stated that in those instances, he usually knew the purpose was for interrupting prescription because they had a cement truck waiting to fill in the well as soon as they completed drilling. He testified that the actions of the Blounts did not indicate to him that their intentions were solely to interrupt prescription.

The Blounts called Robert Gray, District Engineer for the Louisiana Department of Natural Resources, Office of Conservation, to testify next. He testified that all operators in the State of Louisiana must meet the same standards. He stated that to be an operator in Louisiana, the individual or company must fill out a form with the Office of Conservation. Mr. Gray confirmed that Mr. Blount and the Blount Company were approved operators. He testified that there was nothing unusual about the permitting or drilling of the Blount well.

Thomas was called back to the stand to testify. He stated that "throughout the years" the Blounts had conversations with Mr. Webb about

11

putting a prospect together on Section 12. Thomas testified that these conversations included both shallow and deep formations. He stated that their interest in drilling was about more than interrupting prescription; they were interested in production. He testified that they had conversations with numerous people from various aspects of the oil and gas industry when deciding whether to drill, and they relied on the information and advice given to them. Thomas stated that they sent a core sample to Delta Core Analysis, Inc., to be read, and that reading indicated the well needed to be plugged and abandoned. He testified that if the professionals had determined that the well could be economically completed, they would have placed the well in production. Thomas stated that they had already purchased the production casing and had it on site.

The trial court found Mr. Webb qualified to testify as an expert in petroleum geology, prospect generation, oil and gas evaluation, development and management of oil and gas properties, and general oil field practices. Mr. Webb explained his process of making maps of the area over the years. He testified regarding which areas should be good for oil and gas production based on the geological surveys and maps. He explained how these maps were used in deciding where to drill and to which depth.

Mr. Webb testified that he recommended Mr. White to Mr. Blount because he (Mr. Webb) had some health issues and wanted Mr. Blount to have a trusted geologist working the prospect. Mr. Webb also recommended the engineer for Mr. Blount to use. He testified that he would have been more involved in the drilling of the well if he had been in better health. He stated that he reviewed the core analysis from the well and he agreed with

the others that it was not commercially successful—it was a dry hole. Mr. Webb testified that in his expert opinion, the Blount well was drilled with a reasonable expectation of discovering and producing minerals in paying quantities.

William Oliver, Jr., testified as an expert in geology, oil and gas exploration, oil and gas property management, prospect generation, and general industry oil and gas exploration custom and practices. He testified that it is his opinion that the servitude had been interrupted. He is also of the opinion that the Blounts could have expected production in paying quantities from their well. He stated, "When I saw the geology, … you have an oil and gas field to the north, you have oil and gas fields to the south, you have a ridge coming between the two. I can't find a better location than that." Mr. Oliver testified that he agreed with the production estimations given by Mr. White to the Blounts.

Jim Hardwick testified as an expert in geology, specifically petroleum geology, oil and gas exploration, prospect generation, and oil and gas exploration industry custom and practice. Mr. Hardwick testified that he was retained to provide an opinion as to whether the Blounts had a reasonable expectation of obtaining production in paying quantities from their well. He stated that it is his opinion that the well did have a reasonable expectation of encountering hydrocarbons in paying quantities.

Both parties filed post-trial memorandums. The trial court's written opinion was signed November 7, 2018. The trial court noted four of the people with whom the Blounts consulted about the well:

1) Mr. Webb is a geologist who was in the Blount family at the time. He considered the area to be a good prospect for mineral development.

2) Mr. White was a well-respected geologist. The Blounts hired Mr. White before drilling. Mr. White died in 2014, so we do not know what information Mr. White utilized on what work was done. Mr. White was asked to provide expertise along with an engineer, Mr. Connell, to confirm that the well could reasonably be expected to produce in paying quantities.

3) Mr. Oliver is a well respected geologist who reviewed the geology in the area and Mr. White's analogies, and in his professional opinion the Blounts had a reasonable expectation of obtaining production in paying quantities.

4) Mr. Hardwick, a geologist, went on to say that there is no geological information which would indicate that the Blount well would not encounter the targeted formations or that the formations would not be commercially productive.

Factors considered by the trial court in determining whether a well should have been drilled were: the Blounts incurred at least $160,000 in drilling expenses; the well was properly permitted for the depths drilled; the well was logged and cores taken; the time spent drilling the well was sufficient to reach all target formations; and the above-mentioned experts were consulted prior to drilling. The trial court also noted the significant subsequent mineral operations in the area. The trial court noted that Cannisnia did not dispute that the well had been drilled, but argued the Blounts did not drill the well in good faith. It stated:

Based on the objective evidence presented, this court feels the plaintiffs in this case have not proven their case. Therefore it is the opinion of this court that the defendant well was a good faith operation and the defendant servitude be maintained. The court understands, under the circumstances, how the parties could have differing views of the circumstances, so no damages are awarded.

The Blounts filed a motion to tax costs on December 14, 2018, arguing Cannisnia should be taxed with the costs, including expert witness fees. They attached a copy of an email from Cannisnia's attorney, in which

14

he stated he did not anticipate opposing a motion to tax costs, but he did have issues with a couple of the experts' fee amounts. On January, 24, 2019, the trial court signed a judgment stating that for the reasons set forth in its November 7, 2018 opinion, judgment was rendered in favor of the Blounts, Cannisnia's claims were dismissed with prejudice, and Cannisnia was cast with costs, including expert witness fees, in the amount of $88,923.31. Cannisnia now appeals the trial court's judgment.

## DISCUSSION

### *Burden of Proof*

Cannisnia argues the trial court improperly placed the burden of proof on it in this case. It argue thes alleged owner of the mineral servitude has the burden of proving that the servitude has been maintained. It cites the trial court's written opinion which states, "this court feels that the plaintiffs in this case have not proven their case." For this reason, it argues manifest error is inappropriate, and a de novo review is required.

The Blounts argue that Cannisnia presented a misleading quote from the trial court's opinion. They point out that the trial court properly based its review upon the objective evidence presented "such that whichever party bore the burden of proof is of no true moment." They argue that the opinion does not clearly assign the burden of proof to either party. They assert that once it was proven that the well was timely commenced, the "good faith" burden shifted to Cannisnia to prove that the well was commenced in bad faith. The Blounts assert that Cannisnia properly bore the burden of proof to establish that the admittedly timely commenced well was not drilled in good faith.

A mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership. La. R.S. 31:21. Among the modes of extinction of mineral servitudes is prescription from nonuse for 10 years. *See* La. R.S. 31:27. Prescription of nonuse of a mineral servitude commences from the date on which it is created. La. R.S. 31:28. The law provides several methods by which prescription may be interrupted. A trial court's findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard. *Smith v. Andrews*, 51,186 (La. App. 2 Cir. 2/15/17), 215 So. 3d 868, *writ denied*, 2017-0468 (La. 5/19/17), 220 So. 3d 749.

When the prescription of nonuse is pleaded, the owner of the dominant estate has the burden of proving that he or some other person has made use of the servitude as appertaining to his estate during the period of time required for the accrual of the prescription. La. C.C. art. 764; *Smith v. Andrews, supra*. This burden of proof has been applied even when a surface owner sues to obtain the cancellation of a mineral servitude. *Smith v. Andrews, supra; Kellogg Bros., Inc. v. Singer Mfg. Co.*, 131 So. 2d 578 (La. App. 2 Cir. 1961).

Cannisnia filed suit against the Blounts asserting that the Blounts failed to interrupt prescription of the mineral servitude. The Blounts, the owners of the dominant estate, had the burden of proving an interruption of the prescription.

In its written opinion, the trial court detailed the evidence presented by both sides and found that the Blounts' well was a good faith operation

and the servitude was maintained. Cannisnia points to the following language of the trial court: "Based on the objective evidence presented, this court feels the plaintiffs in this case have not proven their case." This language does not clearly indicate that the trial court put the burden of good faith on the plaintiffs. The opinion of the trial court does not state what the burden of proof should be in this case. The actual judgment does not mention the burden of proof; it simply states that the trial court found in favor of the defendants and against the plaintiffs. This one sentence in the written opinion is not enough to overturn the trial court's judgment.

Additionally, the Louisiana Supreme Court has cautioned appellate courts in their review of a trial court's reasons for judgment, stating:

> The problem with the appellate panel's conclusion is that it fail[s] to take into account the well-settled rule that the district court's oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment. Judgments are often upheld on appeal for reasons different than those assigned by the district judges. The written reasons for judgment are merely an explication of the trial court's determinations. They do not alter, amend, or affect the final judgment being appealed[.] (internal citations omitted)

*Wooley v. Lucksinger*, 2009-0571 (La. 4/1/11), 61 So. 3d 507.

For these reasons, we do not find that a de novo review is required. As explained below, we find that the evidence in the record shows that the Blounts met their burden of proof that their mineral servitude has not prescribed due to nonuse. This assignment of error lacks merit.

*Admission of Irrelevant Evidence*

Cannisnia argues the trial court committed legal error by admitting evidence generated after the Blount well was drilled and on which the Blounts did not rely. It argues that the focus should be on the events leading

17

up to the drilling, not subsequent events. Cannisnia asserts that the "reasonable expectation" must have been formed prior to the drilling of the well.

Cannisnia argues the trial court admitted proffered testimony and other evidence that clearly went beyond the information the Blounts had before drilling the well. It argues that the only information the Blounts had before the drilling was information related to the Caruthers well and information contained in Mr. White's report.

The Blounts state that this assignment of error is "baffling" and "confusing." They argue that Cannisnia ignores the eight years of geological information generated by Mr. Webb and continued by Mr. White. They point out that much of Cannisnia's arguments about what should not be allowed recognizes the pre-drilling information and supports their argument of good faith. The Blounts argue that they knew of two successful wells and had the work of two geologists and an engineer. They assert that all information known at the time of drilling the Blount well supported the drilling.

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible. La. C.E. art. 402.

The trial court has great discretion concerning the admission of evidence at trial, and its decision to admit or exclude evidence may not be reversed on appeal in the absence of an abuse of that discretion. *Terry v. Simmons*, 51,200 (La. App. 2 Cir. 2/15/17), 215 So. 3d 410. On appeal, the court must consider whether the contested ruling was erroneous and whether the error affected a substantial right of the party. La. C.E. art. 103; *Id.* If not, reversal is not warranted. The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. *Terry v. Simmons, supra*.

Cannisnia argues that "the trial court admitted a host of proffered testimony and other evidence that clearly went beyond the information the Blount Companies had before drilling the well." It points to two instances in the record where it objected to evidence being irrelevant. It objected during Thomas's testimony regarding mineral prospect conversations with Mr. Webb. Thomas testified that he had conversations throughout the years with Mr. Webb. When asked when the last conversation occurred, he responded that it was within the last year. Cannisnia objected based on relevancy and the trial court overruled the objection. Thomas continued to testify regarding those prospect conversations with Mr. Webb. He did not go into detail, but explained that they continued to discuss prospects of all depths, including the shallows.

Next, Cannisnia made a relevancy objection to the introduction of Mr. Webb's maps. Cannisnia objected that the maps were not part of the Blounts' consideration when drilling the well. The trial court overruled the objection, noting that Thomas already testified that Mr. Webb presented

19

maps to them when trying to sell prospect deals. The trial court stated, "[I]f he says that['s] the case and they've been altered or whatever, then I understand that." The trial court allowed the maps to be introduced, allowing Mr. Webb to testify as to his map process and if the map has been altered since he created it.

We find no reversible error in these admissions. The trial court framed the issue in its opinion by stating, "So what steps did the Blounts take, or what information did they have, before the drilling of this well that would give them a reasonable expectation of finding or producing minerals in paying quantities at a particular depth?" The trial court knew the proper inquiry in this suit and demonstrated that in its discussion of the Blounts' actions prior to drilling.

We do not find a reversible error in the admission of evidence. This is not a case of confusing a jury with irrelevant evidence. Additionally, Cannisnia did not show how they were prejudiced by this evidence. The trial judge was aware of the timeline of the case and which evidence occurred prior to the drilling of the well. This assignment of error lacks merit.

*Reasonable Expectation*

Cannisnia argues that the Blounts failed to carry their burden of proving the Blount well was commenced with a reasonable expectation of discovering and producing oil or gas in paying quantities at the particular depths. It asserts that the first four of the *Indigo* factors relate to this issue and that none of these factors can be decided in favor of the Blounts.

20

The Blounts assert that the evidence overwhelmingly proves that their well was a good faith operation for the discovery and production of minerals. They point out that there are actually 12 *Indigo* factors and this Court has recognized that it is not an exclusive list and is not a substitute for the trial court's credibility assessment.

As stated above, Louisiana law provides that a mineral servitude is extinguished by prescription after 10 years of nonuse. The period of the prescription begins to run on the date the servitude is created and is interrupted by good faith operations for the discovery and production of minerals. La. R.S. 31:28; La. R.S. 31:29. La. R.S. 31:29 states:

> The prescription of nonuse running against a mineral servitude is interrupted by good faith operations for the discovery and production of minerals. By good faith is meant that the operations must be
>
> (1) commenced with reasonable expectation of discovering and producing minerals in paying quantities at a particular point or depth,
>
> (2) continued at the site chosen to that point or depth, and
>
> (3) conducted in such a manner that they constitute a single operation although actual drilling or mining is not conducted at all times.

The question of whether operations in connection with a particular well constitute a use of the servitude in such a manner as to interrupt the running of prescription, is a question of fact dependent upon the particular circumstances under which the operations were conducted and the factor of good or bad faith on the part of the operators is inextricably connected with, although not wholly decisive of, the factual situation presented. *Indigo Minerals, LLC v. Pardee Minerals, LLC*, 45,160 (La. App. 2 Cir. 5/28/10), 37 So. 3d 1122, *writs denied*, 2010-1669 (La. 10/8/10), 46 So. 3d 1274, and,

2010-1677 (La. 10/8/10), 46 So. 3d 1274; *Kellogg Brothers v. Singer Mfg. Company, supra.* As we have already stated, a trial court's findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard.

Before and after the enactment of Article 29, the courts have studied numerous factors in evaluating the presence or absence of good faith sufficient to interrupt prescription on a servitude. Some of these factors include the geology of the drilling site and surrounding area based upon prior wells and seismic data; the expertise and experience of the geologists, petroleum engineers, and oil men making the recommendations and decisions; the depth of review of the available geology; the timing of the lease and its terms; the expenses incurred in the operation; the permit applications; the various types of testing performed; the analysis of formations encountered during drilling; the keeping of well logs; the time put into drilling; the depth drilled; and the size of pipes used. This nonexclusive list, along with the credibility assessment of testimony given at trial, is to be weighed by the trial court in making the good faith determination. *Indigo Minerals, LLC v. Pardee Minerals, LLC, supra*.

The first element of Article 29 is whether the operation was *commenced* with *reasonable expectation* of discovering and producing minerals in paying quantities at a particular point or depth. As the trial court correctly noted, the focus is on commencement—the period of time prior to and beginning drilling, not information after the well was plugged.

The Blounts spoke with Mr. Webb various times over the years (including prior to drilling the subject well) about drilling or putting together

22

a prospect. Mr. Webb recommended they drill to the Nacatoch Sand, which was a known producing zone in the area. Thomas stated that they did not want to drill only to the Nacatoch in order to interrupt prescription, but wanted to produce gas, so they drilled further down to the Tuscaloosa. Thomas referenced a successful Tuscaloosa well about a mile and a half north of their well.

The Blounts hired Mr. White, a geologist, prior to drilling. Mr. White's report indicated that several fields were producing in the area, including the Blossom, Tuscaloosa, and Paluxy sands. Mr. Cowgill, Cannisnia's expert, did not agree with Mr. White's report. He stated that although it was common for geologists to have differing opinions, it was his opinion that Mr. White did not spend enough time developing the well prospect.

The Blounts hired a drilling contractor and properly permitted their well with the Louisiana Department of Natural Resources. After drilling, they sent a core sample to a lab, which indicated the well needed to be plugged. They had already purchased the production casing, although it was not needed. Thomas testified that they would have put the well into production if the professionals had determined it could be economically completed. Mr. Oliver, a geology expert, stated that after reviewing the maps, he agreed with the production estimates of Mr. White. Mr. Hardwick, another expert in geology, testified that he believed the well had a reasonable expectation of encountering hydrocarbons in paying quantities.

As to the *Indigo* factors, the Blounts hired a geologist, consulted with Mr. Webb over the years, visited with oil and gas professionals, hired a

drilling contractor, obtained the proper permits, paid over $160,000 for the drilling of the well, sent core samples to be tested, drilled to their desired depth, and ultimately, followed the advice of the oil and gas professionals to plug and abandon the well. Although Mr. White and the Blounts may not have invested as much time as Cannisnia indicated should have been spent on the development of the prospect, this factor alone does not defeat good faith. If the Blounts' sole concern was the interruption of prescription, they could have drilled a shallower well and spent less time and money drilling. Nothing in our law prevents the drilling of a well in the last year before prescription runs out.

Although it may have made different factual findings and reached a different decision, the appellate court must not reweigh the evidence or substitute its own factual findings. *Ryan v. Case New Holland, Inc.*, 51,062 (La. App. 2 Cir. 12/22/16), 211 So. 3d 611. The trial court observed the witnesses and experts during their testimony and was able to make a credibility determination. After reviewing the evidence as a whole, the trial court was not manifestly erroneous in determining the Blounts' drilling was a good faith effort to produce hydrocarbons in paying quantities. As this ruling is subject to the manifest error standard of review, we cannot overturn the trial court's finding of fact. This assignment of error lacks merit.

*Damages and Attorney Fees*

Because we are affirming the trial court's judgment in favor of the Blounts, there is no need to discuss Cannisnia's damages and attorney fees.

24

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed in favor of the Blounts.  Costs associated with this appeal are cast on the Appellants, Cannisnia Plantation, LLC.

**AFFIRMED.**

THOMPSON, J., dissents.

I respectfully dissent from the majority's determination to affirm the actions of the trial court. The law of Louisiana regarding prescription of mineral interests reflects a historically strong policy against separate ownership of minerals and a policy of keeping land and minerals in commerce. *Ultramar Oil & Gas Ltd. v. Fournet*, 598 So. 2d 645 (La. App. 3 Cir. 1992), *writ denied*, 605 So. 2d 1122 (La. 1992). The underpinning of Louisiana's mineral law exists to provide a mechanism to reunite the mineral interests with the real property in instances where there has been no minimally sufficient effort to produce minerals within the statutorily created confines of the ten-year prescriptive period.

As noted by this court in *Chicago Mill and Lumber Company v. Ayer Timber Company, Inc., et al.*, 131 So. 2d 640 (La. App. 2 Cir. 1961):

> Almost every device conceivable has been employed in an attempt to circumvent our law on this question. In every instance where the Supreme Court has found such an intent it has zealously protected the State's public policy. This vigilance of the Supreme Court has curtailed the attempts of those who seek to withhold mineral rights from commerce beyond the prescriptive period.

One such mechanism utilized to extend the applicable prescriptive period is the assertion by the mineral leaseholder of "good faith operations for the discovery and production of minerals" as outlined in La. R.S. 31:29, which provides the operations must be:

(1) Commenced with reasonable expectation of discovering and producing minerals in paying quantities at a particular point or depth,

(2) Continued at the site chosen to the point or depth, and

1

(3)  Conducted in such a manner that they constitute a single operation although actual drilling or mining is not conducted at all times.

This court has time and again been asked to review considerations of efforts to extend the prescriptive period regarding mineral servitudes and analyze whether such actions were "good faith efforts" including the analysis outlined in *Indigo Minerals, LLC, et al. v. Pardee Minerals, LLC, et al.*, 45,160 (La. App. 2 Cir. 05/28/10), 37 So. 3d 1122, *writ denied*, 10-1669 (La. 10/08/10), 46 So. 3d 1274. This writer is of the opinion that the record of the instant matter contains insufficient objective factors necessary to conclude the operations were in sufficient good faith so as to interrupt prescription considering the nonexclusive list as follows: (1) the geology of the drilling site and surrounding area based on prior wells and the overwhelming lack of success of those wells in close proximity to the drilling location sought in the instant matter; (2) the expertise and experience of the geologist in consideration of the cumulative amount of time the geologist was permitted to devote to this particular undertaking as to those considered more in line with industry averages or standards; (3) the depth of review of the available geography; (4) the analysis of formations; and (5) the depth drilled. There is little doubt that the defendant subjectively believed it had taken sufficient steps to interrupt prescription. The issue at hand is under the specific facts in this matter, were those efforts objectively in good faith so as to interrupt prescription. This writer concludes they were not, and as such I respectfully dissent.

2